WILLIE E. PLEMMONS, IDA (PLEMMONS) CHOLET, ALLE PLEMMONS, EARL PLEMMONS, and ROY PLEMMONS, Appellants, v. TINEY 'PEMBERTON, OTTO WALL, JOE WALL, OLIVER WALL, FRANK STEEN and ELLA RUSSELL.—139 S. W. (2d) 910.

Court en Banc, May 7, 1940.*

---

*NOTE:  Opinion filed at September Term, 1939, April 2, 1940; motion for rehearing filed; motion overruled at May Term, 1940, May 7, 1940.

(45)

*Stillwell & Fendorf, H. M. Atwell* and *Irvin, Bushman & Buchanan* for appellants.

*Barney Reed, Morgan M. Moulder, C. D. Snodgrass* and *Harry H. Kay* for respondents.

48

LEEDY, C. J.—This case reached the Kansas City Court of Appeals on appeal from a judgment for defendants in the Circuit Court of Miller County. The Court of Appeals reversed the judgment, and remanded the case with directions to render judgment for plaintiffs. [Plemmons et al. v. Pemberton et al., 117 S. W. (2d) 392.] Thereafter this court, in a proceeding in certiorari brought by defendants, as relators, held that the case was within the exclusive appellate jurisdiction of this court because involving title to real estate within the meaning of the Constitution; and, accordingly, quashed the opinion and judgment of the Court of Appeals, and retained the case for argument and decision on the merits, which is the matter now under submission. [State ex rel. Pemberton et al. v. Shain et al., 344 Mo. 15, 124 S. W. (2d) 1087.]

The opinion of Judge BLAND, who spoke for the Kansas City Court of Appeals, clearly presents the reasons for the conclusion reached, which we deem to be sound, and we adopt the same. Without resort to quotation marks, but with certain addenda of our own, which will be found set off in brackets, the opinion is as follows:

This is an action, in the nature of specific performance, to enforce the provisions of a contract between George P. Wall and C. M. Wall to make mutual and reciprocal wills to remain unrevoked until their respective deaths. There was a judgment in favor of defendants and plaintiffs have appealed.

The facts show that for a great many years prior to 1916, James, C. M. and George P. Wall, owned, as tenants in common, a farm in Miller County near Brumley, which they conducted as partners, farming and stock operations. The profits they earned from their partnership activities were divided among them. Each had his own bank account and kept his own securities in his own name.

These men lived unmarried and alone, "batching." They had but one sister, Frances B. Plemmons, who would come to their house and "clean up for them." The relationship between the brothers and sister was very friendly.

Shortly before the 4th day of March, 1916, James Wall died intestate, leaving a number of heirs, aside from his two brothers. A dispute arose between the brothers and their heirs, including Frances B. Plemmons, resulting in "some hard feelings." However, the brothers bought out the interests of the other heirs.

Shortly after James died, George P. Wall told the witness, McCubbin, that he and C. M. Wall did not have any wills, but that they were going to make them, "to each other."

George Helton, who was engaged in the mercantile business in Brumley, testified that on March 4th, 1916, he drew separate wills for George P. and Crockett M. Wall, under the following circumstances. The two men came to him and asked him if he could write "them a will." He replied to the effect that he could; that he was too busy that day and for them to come back another time and "they told me how they wanted them written and who they wanted it to go to."

"Q. Did you prepare a tentative will before you prepared the last will? A. Well, I would call it an outline more, more of an outline of their *agreement* first. . . ."

"Q. Now, when they came to you to make a will, did they talk to you about how they wanted to have their property, and tell you why? A. Yes, sir; they told me that they wanted this will wrote—made to Fannie (Frances B. Plemmons) and her children. . . . And so then, when they came back, I believe that was about the end of the week, I told them that we would fix it up now as quick as we could get the witnesses, we could get it ready for them. . . ."

"Q. What was said about how they would dispose of their property, if anything? A. Well, they said that they wanted it made to each other, *that was the agreement, until their death,* and then they wanted it to go to Fannie, and her children.

"Q. Were you in fact making one will or two wills? A. One, absolutely one will.

"Q. And did they understand that? A. Yes, sir; they did.

"Mr. Kay: We object to that as calling for a conclusion, for the reason the record shows two wills were made.

"The Court: Overruled.

"Mr. Irwin: They thoroughly understood that? A. Yes, sir; they did.

"Q. Who did the talking to you, George or Crockett (C. M.)? A. Well, they both did the talking, and both made suggestions, and I couldn't say which one did the most talking, but they both made about—one about as much as the other. Probably George was more talkative than Mr. Crockett Wall was.

"Q. Now, did you prepare the will the way they wanted it? A. Yes, sir.

"Q. Were there two wills, both in your handwriting? A. Not two wills, but it might have been on two pieces of paper, it was intended just a personal agreement for one will for the two of them.

"Mr. Kay: Just a minute, we object to his statement as to what they intended for the reason that they were written instruments, unambiguous in their terms and speak for themselves.

"The Court: Sustained."

The witness was then shown the two wills that he had prepared. He stated that they were in his handwriting. He then testified: . . .

"Q. Did you know how to prepare a joint will and put both of them in the same will? A. Yes, sir.

"Mr. Kay: We object to that as leading.

"Q Is that what you intended to do by that? A. Absolutely.

"Mr. Kay: We object to that.

"The Court: Overruled.

"Q. Is that what they told you they wanted? A. Yes, sir; yes, sir.

"Q. Now then, was it acknowledged by them? A. Yes, sir."

The wills prepared by Helton and executed by George P. and Crockett M. Wall were identical in their terms. Both wills were drawn on the same day, at the same place, separately witnessed by the same persons and in each will the maker of the other was given a life estate with full power to sell or dispose of the property as he might see fit for his own use and the remainder, after the death of the life tenant, was bequeathed "to our sister Frances B. Plemmons and her five children viz., as follows: Willie L. Plemmons, Ida Plemmons, Alle Plemmons, Earl A. Plemmons and Roy F. Plemmons to be divided into equal parts between them."

Several of the witnesses to the wills testified concerning the circumstances of their execution. Claude Devore testified that George P. Wall asked him to witness the will; that the wills were prepared in the witness' presence by George Helton; that either C. M. or George

P. Wall "dictated" the wills; that George P. Wall "called it a 'jint' will. It was supposed to be Joint, but he spoke of it and said 'jint'."

"Q.- He called it a 'jint' will? A. Yes sir."

John Connor testified that "awhile after James' death" he heard C. M. and George P. Wall say: "Well, they said they were going to make a will, and they were going to give what they had to her (Fannie B. Plemmons) when they got through with it, and they made these wills, one to each other, very near that time, and at their deaths it went to Fannie, and her heirs. . . .Well, they said, they wanted, the way they had done over James' estate, they were going to see that they got no more of their money, or anything they had, and they was going to fix it so they couldn't? A. They were going to make these wills, joint wills, they called them.

"Q. They called it a joint will? A. Yes sir.

"Q. Who called it that? A. George Wall. . . . The day they made the will and wrote it up there, and we signed it, they talked about making a joint will there.

"Q. They talked about what? A. Talked about it being a joint will.

"Q. That was while they were two of them together, present. A. There at Helton's, yes sir."

Homer Thompson testified that "Roy Plemm" requested him to come to Helton's house to witness the will and he heard C. H. and George P. Wall talking about it at the time it was being made.

"Q. What did they say in regard ito it? A. Well, the will was read over, and they both said they—that was just the way they wanted it.

"Q. Was there anything said there in that conversation about a joint will, or a 'jint' will. A. Yes, sir; I think there was.

"MR. KAY: I object to leading the witness.

"THE COURT: Overruled.

"THE WITNESS: That is what they called it, a 'jint' will. . . . Well, this is about all I know about it. They just said that is the way they wanted it, and it was read over, and they got me for a witness."

The witness, McCubbin, in addition to testifying that C. M. and George P. Wall told him that they were going to make wills, further stated that they said: " 'We are going—we was aiming to make them to each other, as one of us dropped off it went to the others, until the last one' passed out, and it then went to Fannie (Frances B. Plemmons) and her heirs.' " "And that was the way they were going to fix it, and I suppose they made them that way, the two of them.

"Q. Now, did you witness the will? A. No sir.

"Q. Did you talk with either of them afterwards about the will? A. Oh, different times, they would speak about having it fixed.

"Q. What did they call the will? A. A *contract*, that is what they called it.

"Q. Did they tell you how they had it fixed? A. No, sir; they didn't tell me exactly how they was going to fix it, and he said to me in going from the store up by my home—they passed my house every day going to the stores, and back at night. He says, 'We got that fixed just like we wanted it, and there will be no more dividing up.'

"Q. There will be no more what? A. 'We got that fixed just like we wanted it, and there will be no divides', that was all he said. Of course, I took it—

"Q. (Interrupting) Who said that? A. That was George and Crockett was with him, but Crockett didn't talk as much as George, he just listened and went ahead." (Italics ours.)

Crockett M. Wall died on August 30th, 1932. His will was probated. The inventory of the estate showed real estate of the value of $2000 and personal property of the value of $12,042.19. In November 1933 an order of distribution was made, and, under it, George P. Wall received the personal estate and delivered his receipt therefor to the executor.

On July 22nd, 1936, George P. Wall made a second will, in which he made a different distribution of his estate than he had made by the will dated March 4th, 1916. He died on August 2nd, 1936.

At the time of the death of George P. Wall, his sister, Frances, had died and this action is brought by her children named in the wills of March 4th, 1916.

Very little of the personal property received by George P. Wall from the estate of Crockett M. Wall was used by him but, as before stated, he accepted the property given him under the will of his brother.

All of the testimony was adduced by the plaintiffs and at the close thereof the court entered judgment setting aside to the plaintiffs the estate which came to George P. Wall by virtue of the will of C. M. Wall and, by which will, George P. Wall received a life estate therein. But the court found and decreed that the wills of C. M. and George P. Wall, executed on March 4th, 1916, were not joint wills nor mutual wills and the same were not made pursuant to any contract between them; that each was a separate will of the testator executing the same.

It is insisted by the plaintiffs that the court erred in rendering the decree for the defendants and that it should have been for the plaintiffs.

It is well settled that reciprocal and mutual wills, such as those executed by C. M. and George P. Wall, on March 4th, 1916, if not founded on, or embodying, any contract may be revoked, like ordinary wills, at the pleasure of the person making them, without entailing any violation of contract. [69 C. J., p. 1299.] However, a contract to make mutual wills to remain unrevoked at the death of the parties, is valid and enforcible if fair and just, definite and cer-

tain in its terms and as to the subject matter and based upon a sufficient consideration, 69 C. J., p. 1300, and if such a will is afterwards revoked by one of the testators, after the death of the other, an action may be brought upon the contract by the beneficiary under the will of the deceased, such action not being for the revocation of the will but upon the contract or agreement. [Keasey v. Engles, 259 Mich. 178, 242 N. W. 878; Green v. Whaley, 271 Mo. 636, 654, 197 S. W. 355.] This is especially true where the survivor avails himself of the provision of the will in his favor and accepts the benefits thereunder. [69 C. J., pp. 1300, 1302.]

The rule is well stated in Clements v. Jones, 166 Ga. 738, 742, 743, 144 S. E. 319, 322, as follows: "The general rule is, although not undisputed that if two persons execute wills at the same time, either in one or two instruments, making reciprocal dispositions in favor of each other, the mere execution of such wills does not impose such a legal obligation as will prevent revocation. By the weight of authority agreements to make wills are not established merely because two persons make some reciprocal testamentary dispositions in favor of each other; the language of such will containing nothing to the effect that the instruments are the result of a contract. The case is different, however, where the mutual wills are the result of a contract based upon a valid consideration, and where, after the death of one of the parties, the survivor has accepted benefits under the will of the other which was executed pursuant to an agreement. In such cases, where all the facts are fully proven, equity will interpose to prevent fraud. . . . However, to enable one to invoke the intervention of equity, it is not sufficient that there are wills simultaneously made, and similar in their reciprocal provisions; but the existence of a clear and definite contract must be alleged and proven, either by proof of an express agreement, or by unequivocal circumstances." A great many authorities are cited in support of this statement of the law, including a number of those cited by the respective parties to the case at bar. [See Elmer v. Elmer, 271 Mich. 517, 260 N. W. 759; Clements v. Jones, 166 Ga. 738, 144 S. E. 319; Ridders v. Ridders, 156 Ore. 165, 65 P. (2d) 1424; Beveridge v. Bailey, 53 S. D. 98, 220 N. W. 462, 60 A. L. R. 619; Stevens v. Myers, 91 Ore. 114, 177 P. 37; Schramm v. Burkhart, 137 Ore. 208, 2 P. (2d) 14; Taylor v. Waite, 140 Ore. 680, 14 P. (2d) 283; Tate v. Emery, 139 Ore. 214, 9 P. (2d) 136.]

In the present case the wills were drawn as separate instruments. Each was unambiguous, distinct from the other and the disposition of the property of the respective testators is definite and certain. Neither one refers to the other. Nothing expressly appears on their face to indicate that the one was made in consideration of the other.

As to the nature of evidence necessary to establish an agreement of

54

the kind in question, it was stated in the leading case of Edson v. Parsons, 155 N. Y. 555, 567, 568, 50 N. E. 265, 268: "Would it be the duty of a court of equity to refuse that relief [specific performance] where the agreement sought to be given effect was not certain and definite. Clearly, it should hesitate to assume the grave responsibility of implying an agreement, whose existence depends upon circumstances inconclusive in their nature, and permitting an inference either way. It is not essential to the intervention of equity, in order to prevent the accomplishment of fraud, that an agreement should be established by direct evidence. It may be established from such facts and circumstances as will raise an implication that it was made, and may have reinforcement from the evidence of the conduct of the parties, at the time and subsequently. But, concerning as it does the statutory right of a person to dispose of his property after his death by a last will, the court should refuse to interfere unless the agreement depended upon for the award of relief demanded has been clearly and definitely established. The law permits a person to dispose of his property at his pleasure. He may make a valid agreement, binding himself to make a particular testamentary disposition of his property, if it be a reasonable one, and he may validly renounce the power to revoke his will, in the absence of fraud or deceit. Equity will enforce such an agreement, when well and fairly founded, and will not suffer him to defraud and to defeat his obligation by another will. But the court must have full and satisfactory proof of the agreement. . . .

█ "A general maxim which equity recognizes is that a testator's will is ambulatory until his death. It is a disposition of property which neither can nor is supposed to take effect until after death. I think it needs no further argument to show that to attribute to a will the quality of irrevocability demands the most indisputable evidence of the agreement which is relied upon to change its ambulatory nature, and that presumptions will not, and should not, take the place of proof."

In Wanger v. Marr, 257 Mo. 482, 493, 165 S. W. 1027, 1031, it is stated: "While direct evidence of the existence of such a contract is not indispensable, yet the contract must be proved by evidence measuring up to the standard fixed by the authorities cited [including Edson v. Parsons, supra] and principles adverted to in the preceding paragraph."

Consequently, the mere fact that the two wills in the case at bar, upon their face, purport to be reciprocal and mutual wills and contain similar or identical provisions and that they were drawn by the same scrivener, executed at the same time and before the same witnesses, with full knowledge, on the part of each testator, of the contents of the other will, and were clearly made for the accomplish-

ment of a common purpose, although such circumstances are to be regarded as some evidence that they were made in pursuance of an agreement (Wallace v. Wallace, 71 Misc. 305, 130 N. Y. S. 58), is not sufficient evidence of a contract to make wills to remain unrevoked at the deaths of the testators. [69 C. J., pp. 1304, 1305.] Even the fact that the evidence (other than the wills themselves) may show that the wills were made pursuant to *some* agreement is insufficient. An agreement to make reciprocal and mutual wills is performed when the wills are made. [Howells v. Martin, 101 N. J. Eq. 275, 278, 137 A. 565; Beveridge v. Bailey, supra.] The agreement to be enforcible must be to dispose of the property as therein provided, or not to revoke such wills; that the wills shall remain in force at the death of the testators. [69 C. J., p. 1300.]

However, as before stated, it is not necessary that the agreement be established by direct evidence. If the contract does not expressly appear in the language of the wills, the agreement "may be supplied by competent witnesses who testify to admissions of the testators, or an express promise may be shown, evidence is also admissible of such facts and circumstances, and such relations of the parties, as to give rise to an implication that such an agreement was made, and such implication may have reinforcement from evidence of the conduct of the parties at the time of making the wills, and subsequently. Thus for the purpose of showing that reciprocal wills were intended to be mutual, evidence may be admitted of facts tending to show that each of the parties acted, in making his will, with the knowledge of the other, that the two wills were drawn by the same person, at the same time, and at the joint request or directions of both parties, and, even though their dates differ slightly, that they were in fact executed in pursuance of a common purpose and understanding." [69 C. J., p. 1034.]

In Williams v. Williams, 123 Va. 643, 649, 650, 96 S. E. 749, 751, it was stated: "Undoubtedly the proof of the agreement and consideration must be clear and satisfactory (Schouler on Wills, sec. 454; 40 Cyc., p. 2118-c; Swann v. Housman, 90 Va. 816, 20 S. E. 830); but in the instant case we think this condition is fully met. Proof of a testamentary compact may expressly appear in the language of the instrument, or it may be supplied by competent witnesses who testify to admissions of the testators, or it may result as an implication from the circumstances and relations of the parties and what they have actually provided for by the instrument. Direct evidence is not necessary. [40 Cyc. 2118.]"

The majority rule as stated in Clements v. Jones, supra, and the rule relative to the sufficiency of the evidence to establish such agreement are well settled. The only difficulty is in applying the law to the facts in a given case. The facts in each case, of course, naturally differ. We find no two cases alike. The proper determination of

this case depends upon the construction to be put upon the testimony of the witnesses relative to the circumstances under which the two wills in question were made.

■ This is a suit in Equity and it is the duty of this court to review the evidence and come to its own conclusion relative to the matter. Ordinarily, an appellate court, in Equity cases, will defer to the findings of the Chancellor, but it does not do so where there is no conflict in the evidence and the witnesses are not impeached and there is no impeaching circumstance connected with their testimony. [Stinson v. Bank of Queen City (Mo. App.), 101 S. W. (2d) 537.]

As before stated, the testimony adduced was all on behalf of the plaintiffs. From an examination of it we find there is no conflict in it and no impeaching circumstances connected with it. All of the testimony tends to show that C. M. and George P. Wall were desirous of making joint wills in favor of each other. The witness Helton, the scrivener, was not a lawyer. It appears to have been his idea that two identical wills executed by the respective testators constituted a joint will. He testified that he knew how to prepare a joint will and that was what he did in this instance.

It is claimed by the defendants that the testimony of Helton concerning the agreement had between C. M. and George P. Wall, including his statement that the agreement of the brothers was that their property was to go to each other until their death and then to Frances Plemmons and her children, was merely an expression of his opinion brought out by leading questions propounded to him by counsel for plaintiffs, in which counsel referred to the matter ''as a will.''

It is true, counsel did refer to what was executed as ''a will,'' but we find that to most of the leading questions propounded the Court sustained objections. For instance, he was asked: ''What did they say, if anything, about having an agreement about how they would dispose of their property?'' Objection was sustained on the ground that the question was leading. The witness was asked: ''Q. What was said about how they would dispose of their property, if anything? A. Well, they said they wanted it left to each other. That was the agreement, until their death, and at that time they wanted it to go to Frances and her children.'' The witness was then asked whether he was, in fact, making one or two wills, and shortly after: ''Q. Were there two wills, both in your handwriting?''

So we fail to find that the witness' testimony is the result of a mistake as to how many wills he had made, but it is clear enough that he thought that in drawing two wills in substantially the identical language, he was preparing what he considered to be a joint will. The statement: ''Well, *they said they wanted them made to each other, that was the agreement until their death, then they wanted it to go to Fannie and her children,*'' was not an expression of opin-

ion but a direct statement of a fact and direct evidence that an agreement was made between the two testators to make wills to last until their deaths.

[In approving this pivotal holding, it is well enough for us to point out the reason we think the italicized matter is not merely the conclusion and opinion of the witness. It will be observed that it reads, "Well, *they said* they wanted them made to each other." So far there can be no question but what this was the statement of a fact, i. e., what was said between the brothers. The troublesome feature comes in what immediately follows, "that was the agreement until their death," which, if standing alone, we would say constituted an inference or conclusion drawn by the witness as to the effect of what was said. This offending statement was not challenged by objection or motion to strike. We think it should be disregarded because, as we construe it, it was said only parenthetically in connection with the narration of the substance of the conversation, which was that the brothers *said* "they wanted them made to each other . . . until their death, then they wanted it to go to Fannie and her children."]

The testimony of Helton is well substantiated by that of other witnesses, as well as the circumstances connected with the execution of the wills themselves. According to this testimony it was the desire and intention of the testators to make a joint will and it was their belief that one had been made; that after the death of James Wall, George P. Wall stated to the witness McCubbin to the effect that they were not going to have any dispute about the division of the property of the testators such as they had had over the settlement of the estate of James Wall; that they were going to make wills "to each other . . . *until the last one passed out*" and that the property was then going to go "to Fannie and her children." After the will was made George P. Wall, in the presence of C. M. Wall, stated to the witness: "We got that fixed up just like we want it. *There will be no more dividing up* . . . there will be no divides." The witness further testified that the testators referred to what they had done as a "contract."

John Connor testified that the testators, shortly after the death of James Wall, stated to him that they were going to give to Frances Plemmons "What they had when they got through with it . . . after their death, it went to Fannie and her children"; that they were going to fix things so that there would be no disputes over the estate such as had occurred over James Wall's estate; that George P. Wall said, they were going to make joint wills and that upon the signing of the wills testators talked about "there being a joint will." Claude Devore and Homer Thompson testified that, while the wills were being written, George P. Wall stated that the will was a "jint" will.

Of course, the will, upon their face, while not sufficient of themselves, to establish an agreement that they were to be lasting, afford some evidence tending to support this contention. They contain substantially identical provisions. They were drawn by the same scrivener, executed at the same time, before the same witnesses, with full knowledge, on the part of each testator, of the contents of the other's will and were apparently to accomplish a common purpose.

We are of the opinion that an agreement to make reciprocal and mutual wills to remain unrevoked until the death of the testators was established, not only by the preponderance of the evidence, but by direct evidence devoid of uncertainty. This evidence, in our opinion, meets the requirements of the rule that the agreement be established by clear, definite, convincing, unequivocal and satisfactory testimony and, therefore, we believe that the court erred in rendering judgment in favor of defendants.

We have examined the cases cited by the defendants and find them not in point. We do not find any circumstances stated in the opinion in the case of Edson v. Parsons, supra, at all parallel to those in the present case. As to the facts in that case the court said: "It was not claimed by the appellant that there was any formally expressed contract between the sisters, or that such a contract for the making of mutual wills is evidenced, except by the wills themselves, and by some facts relating to and illustrating their making and execution, and the strong attachment which united the sisters to their brother."

The judgment is reversed and the cause remanded with directions to render judgment for plaintiffs. All concur.

