**HART et al.   v.   HINES et ux.**

No. 43516.

Supreme Court of Missouri.
Division No. 1.

Dec. 14, 1953.

G. C. Beckham, Steelville, James M. Douglas, Richard L. Eckhart, St. Louis, Thompson, Mitchell, Thompson & Douglas, St. Louis, of counsel, for appellants.

Breuer & Northern, Rolla, Charles E. Wilson, Elkhorn, Wis., for respondents,

COIL, Commissioner.

Charles E. and Alice E. Hart, husband and wife, executed a will on September 8, 1943, containing this language: "It is our intention in making this will to make a joint will wherein the survivor may enjoy all the property during his or her life time, with that intention we devise and bequeath to each other all our holdings whether it be real, personal or mixed property; and at the death of both of us, it is our wish and desire that the property be disposed of as follows: * * *." Then followed a direction as to debts and funeral expenses, specific bequests of money and personalty, and a specific devise of certain realty (not here involved). Item Fourth provided that the "residue of our estate" was to go in equal shares to the sons of Charles E. Hart and to named nieces and nephews of Charles E. and Alice E. Hart, respectively.

Charles E. and Alice E. Hart continued to live together as husband and wife until

her death on January 18, 1949. They owned, by the entirety, a home in Cuba, Missouri, at the time the will was executed and at the time of Mrs. Hart's death. Charles E. Hart conveyed by warranty deed the Cuba property to defendants Hines (husband and wife) on December 21, 1949. The joint will was first probated after Charles E. Hart's death on February 15, 1952. Defendant Oscar J. Hines, named in the will as executor, qualified as such, and was so acting at the time of the trial.

Plaintiffs-respondents, all but two of the residuary legatees (the other two residuary legatees, Eugene Hart and Lulu Suckow, were made defendants), sought a judgment declaring the joint will irrevocable after the death of Alice E. Hart and setting aside and cancelling the deed from Charles E. Hart to defendants-appellants Oscar J. and Elthie Hines.

The trial court found, among other things, that prior to the making of the will "a domestic pre-arrangement was made between the parties looking to a final equitable division of their property between his children and her heirs and relatives after the death of both parties, the survivor of which was to enjoy all the property during his or her life time, and which arrangement culminated in the joint will of the parties, * * *", and that the Cuba property, owned by the entirety, "fell under the provisions of the will and was included in the property of the parties making the will and accordingly, disposed of by them by the terms of the will"; and granted the relief sought by plaintiffs.

█ In reviewing this case, we weigh the evidence and reach our own conclusions as to its weight, taking into account the trial court's position to judge the credibility of witnesses. McElroy v. Mathews, Mo. Sup., 263 S.W.2d 1; J. E. Blank, Inc., v. Lennox Land Co., 351 Mo. 932, 952[1], 174 S.W.2d 862, 865[1, 2].

██ The parties have briefed several matters. The view we take, however, makes a determination of a single proposition decisive of the case. Equity will under proper circumstances enforce a prior agreement that a joint will remain irrevocable after the death of one of the testators. And a husband and wife may by prior agreement between them include within the dispositive terms of a joint will property held by the entirety. Stewart v. Shelton, 356 Mo. 258, 264, 265[3], 201 S.W.2d 395, 398[7], [8, 9], [10, 11]; Plemmons v. Pemberton, 346 Mo. 45, 52[1], 53[2], 54, 139 S.W.2d 910, 914[1, 2], 915[3, 4], 916 [5, 7]. For the purposes of this opinion, we shall assume, without deciding, that instant testators entered into a definite, unambiguous agreement to make a joint will which was to be irrevocable by the survivor and that such agreement as originally made included as part of the property to be disposed of by the joint will, their Cuba home held by the entirety. And we shall further assume, without deciding, that but for the testimony to be presently noted, there was sufficient circumstantial evidence which, together with the above-quoted terms of the will, constituted sufficient substantial probative evidence to support a finding that a prior agreement existed as to irrevocability of the proposed joint will. Making these assumptions, we are confronted with the uncontradicted testimony of the lawyer who drew the will. The pertinent parts of his testimony, to which no objection was made, were:

"Q. Now, Mr. Roberts, did Mr. and Mrs. Hart come to your office together on that occasion? A. They did. I think they were in there a day or so before I prepared this.

"Q. You think they came to your office on two different occasions with respect to the will? A. Yes sir; that is right.

"Q. Now, on the first occasion that they came there, would you relate to the Court just what the conversation was between you and them with reference to preparation of this will? A. Yes, they brought with them a New

York will, if I remember right, a will that had been drawn in New York. And it was a joint will, man and wife, and asked me about preparing their will, and gave me that as a form or something to go by.

"Q. Now, on that occasion did you discuss with them who they wanted to name as the beneficiaries in their will? A. I am sure I brought the stenographer in after a little while, and they gave me the names of those they wanted to have named in the will.

"Q. And did you make notes of those statements? A. I made notes of that.

"Q. Now, Mr. Roberts, in that conversation was there anything said with reference to the Hart home, where Mr. and Mrs. Hart lived in Cuba? A. Yes. I asked them about the extent of their property, and the kind of property each one had. And they had, I think, maybe cash of some twenty-five or thirty may be a little more than that in cash—and some bank stock, and I believe there is a piece of property down on the river that was probably in Mrs. Hart's name. And then, when we came to the home, I asked them about how the property was held, and they said 'by the entirety', or, they didn't say 'by the entirety', but they said 'man and wife'—they both owned it, and I said 'by the entirety'. And I said, 'Well, your will wouldn't cover that'. It was my impression in drawing a will, that where a man and wife owned it together, that that was already fixed by law, and on the death of one it passed to the other.

"Q. And did you so advise Mr. and Mrs. Hart? A. I so advised them, that any will drawn would not affect that property. And they further stated in that conversation that was really the way they wanted it anyway, because they might want to dispose of it in a different way.

"Q. Well, did either of them say what different way they might want to dispose of the home? A. Well, they talked about Mr. and Mrs. Hines, and it was suggested by one or the other— I am not going to say which one of them made the statement—that Mr. Hines ought to have the home, Mr. and Mrs. Hines ought to have the home.

"Q. Well, was the other one present when one of them made that statement? A. Yes sir; I wouldn't say which one made the suggestion, whether it was Mr. or Mrs. Hart that made the suggestion. * * *

"Q. And they told you that they wanted whichever survived the other to have the full use of whatever property they owned, and then at the survivor's death they gave you the names of the various heirs they wanted to receive their property? A. That is right, except the real estate, that was owned by both of them.

"Q. Except the real estate? A. Except the real estate, that was owned by both of them by the entirety, the will was not to cover that.

"Q. Well, there wasn't anything in the will that said that, was there? A. No, sir; it was my idea at the time I drew this will, that property held by the entirety was not covered by the will, that the law had already fixed that, and that any will would not affect it in any way. * * *

"Q. Now, Mr. Roberts, you didn't write anything into the will providing that they could dispose of the property? A. No sir; it was understood at the time I drew the will that I wasn't to draw anything that would affect the home property, because that was held by the entirety.

"Q. Didn't they have other property that was held by the entirety? A. Not that I knew of.

"Q. You don't know whether they owned any other real estate by the entirety? A. I know of no other, I don't think they had any, at least they didn't tell me if they had any."

If credence be given to the foregoing testimony, only one conclusion is possible, viz., that whatever prior agreement may have existed as to irrevocability of the joint will, and whatever prior agreement may have existed as to whether the Cuba home was to be covered by the joint will, the latter prior agreement was clearly modified or changed or a new agreement was made prior to the time the will was prepared and executed, that the joint will actually executed was not to cover the Cuba home. It follows that if the Harts so agreed, the surviving testator's deed, conveying the Cuba home to defendants Hines, was a valid conveyance.

As we have noted, there was no evidence contradictory of Mr. Roberts' testimony; nor was there any other evidence which bore upon, or from which an inference could be made relative to, the testators' agreement as to the exclusion of the Cuba property from the provisions of their joint will. And any inferences which might otherwise be drawn as to what "domestic pre-arrangement" or prior agreement may have existed between husband and wife which culminated in the joint will, are not tenable in the face of this direct, positive testimony. Nor is there anything in the language of the will (the Cuba property was not specifically mentioned therein) which reasonably permits a contrary conclusion.

The trial court did not discuss the testimony of Mr. Roberts. From the findings heretofore noted, we must conclude, however, that the trial court either ignored this testimony or refused to give it any force or effect. The record indicates no reason to disbelieve this clear and unequivocal testimony. And plaintiffs in their brief say: "It should be understood that we mean to cast no reflections or insinuations against Mr. Earl E. Roberts,

who drew the will and testified as a witness on behalf of the defendants but we do point out that he was the attorney for Mr. Hines, and had been paid $942.15 for his services in preparing a semi-annual report to the Probate Court, which was more or less a perfunctory proceeding, and his evidence clearly reveals disposition on his part to testify in the light most favorable to the defendants. And reading of his testimony reveals that he was more or less uncertain and indefinite as to his recollection of all that was said and done in connection with the writing of the will. But, he was more or less certain in his statement that he advised the Harts, in substance, that the property held by the entirety was not the subject of a will and was already fixed by law. He further testified that they might want to make some disposition of the home property in the future and that one of them said, 'that Mr. Hines ought to have the home,' but nothing to that effect was included in the will." The record indicates that the $942.-15 fee referred to was in fact received by a lawyer son-in-law of Mr. Roberts. But, we may add, Mr. Roberts did testify that he represented defendant Oscar J. Hines as executor of another estate, and that he had represented Mr. Hines' brother.

None of these matters, however, in our opinion, justified the total disregard of this decisive testimony. None indicates an interest sufficient to destroy the witness' credibility. This is not a case in which the trial chancellor had to determine the credibility of two witnesses who testified differently on the same subject, justifying our deference to the trial chancellor's judgment. In any event, we have the duty to weigh the evidence and reach our own conclusions as to its weight, and we usually do not defer to the findings of the trial chancellor "where there is no conflict in the evidence and the witnesses are not impeached and there is no impeaching circumstance connected with their testimony." Plemmons v. Pemberton, supra, 139 S.W.2d at page 916[10, 11]. We have

concluded that the credible evidence demonstrates that the testators' home, owned by them by the entirety, was by testators' prior agreement excluded from the dispositive terms of their joint will; and that the Hart deed to defendants Hines conveyed to them fee simple title to that property.

The trial court in its findings indicated another reason for its judgment, viz., that since defendants Hines were the beneficiaries of a $1,500 bequest in the joint will, and since, after Hart's death defendant Oscar Hines probated the will, and he and Mrs. Hines accepted the bequest, he (they) had elected to accept the terms of the will and "he is now bound by the terms of the will and could not accept so much thereof as agreeable to him and reject portions of the will not to his liking but is bound by the whole instrument." It seems apparent that the doctrine of election has no application to instant facts. Plaintiffs-respondents do not here contend that the judgment below may be sustained on that theory. If, as the evidence showed, the Harts had agreed to exclude the Cuba "entirety property" from their joint will, then Charles E. Hart was free to convey that property after Mrs. Hart's death. Certainly, the acceptance by the Hineses of a specific bequest in the joint will could not amount to an election invalidating the deed executed and delivered two years before Hart's death, to property excluded from the provisions of the joint will by agreement between testators.

The judgment is reversed and the cause remanded with directions to enter a judgment in favor of defendants-appellants Oscar J. Hines and Elthie Hines.

VAN OSDOL and LOZIER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.