Thomas J. HAMPTON, Appellant,

v.

Ruth Earline NIEHAUS and Clarice Marie Cowan, Respondents.

No. 47155.

Supreme Court of Missouri,

Division No. 1.

Dec. 14, 1959.

Shifrin, Treiman, Agatstein & Schermer, Louis Shifrin, St. Louis, Morris A. Shenker, St. Louis, for appellant.

Michael J. Doherty, William Kohn, Leonard S. Williams, St. Louis, for respondents.

COIL, Commissioner.

Appellant Thomas J. Hampton, plaintiff below, married his second wife, Ollie, in 1947 or 1948 and they lived together as husband and wife until Ollie died intestate on June 24, 1955. On November 14, 1951, Nannie V. Castlen, by her warranty deed, conveyed the premises known and numbered as 5373 Theodosia Avenue to Ollie Hampton and the record title so conveyed was in Ollie at the time of her death. Respondents Mrs. Niehaus and Mrs. Cowan, defendants and cross-claimants below, Ollie's daughters by a former marriage, are her sole heirs.

Although by reason of plaintiff's voluntary dismissal of his original petition after trial had begun, the case proceeded upon defendants' cross bill and the subsequent pleadings, the issues litigated were whether, as plaintiff contended, a resulting trust in the property arose in his favor at the time the title thereto was placed in Ollie and, if not, whether defendants, as those in whom title vested at their mother's death, were entitled to an accounting from plaintiff for the rents and profits he derived from the real estate subsequent to Ollie's death, and, alternatively, whether plaintiff put the title in his wife's name to defraud his former wife, an alleged judgment creditor by reason of an alimony judgment, by preventing her from reaching the property in question on execution. The trial court adjudged that defendants, Mrs. Niehaus and Mrs. Cowan, had fee simple title to the real estate in question upon the death of their mother and that plaintiff had no right, title, or interest therein except dower, and that defendants were entitled to an accounting for the rents and profits from said real estate from and after June 24, 1955. The trial court, entered a final judgment with respect to its ruling as to title and the right to an accounting and retained jurisdiction to later hear and determine the matters pertaining to an accounting and assignment of dower. Plaintiff has appealed from the final judgment so rendered.

A real estate broker, who drew the deed and at whose office the transaction occurred by which title to the Theodosia property was conveyed, testified that Ollie was not, and only plaintiff and the grantor were, present at the time the transaction was consummated; that at that time plaintiff paid to grantor the sum of $4,620.49. (The witness also said that he, at the time of the transaction, had prepared a deed of trust at Mr. Hampton's direction. The details of the deed of trust and of other matters with respect to it were excluded by the court on the objection of defendants, but it was clear from the statements made by counsel for plaintiff that the deed of trust, which was never executed, was on the property in question to be given to plaintiff Hampton by his wife Ollie for the money he paid to the seller. If so, a reasonable conclusion is that plaintiff was advancing

the purchase price as a loan to his wife and thus it is probable that no resulting trust arose. Rest., Trusts 2d, Vol. 2, § 445, p. 407. Inasmuch, however, as defendants' objections prevented plaintiff from developing the evidence with respect to the mentioned deed of trust, we should and do ignore the testimony and statements of counsel on that subject.)

Plaintiff testified that he furnished the cash to make the purchase; that the property was a 2-storied single residence in a state of disrepair; that he completely remodeled it and changed it into a 2-family residence; that he, without assistance from his wife, employed workmen and artisans to do the remodeling and did some of the work himself; that the work covered a period of two years, during which time the property was vacant; that he paid for all the repairs with his own money; that the property was rented about June 1953; that he collected the rents and did not account therefor to his wife; that at one time he offered the property for sale without consulting his wife; that he paid taxes on the property through 1956 with his money; and that there was a $1,200 deed of trust against the property which he paid when it became due during the lifetime of Ollie. (The warranty deed did not disclose an outstanding deed of trust.) He said further that his wife did not have any money during the time she was married to him and although she was working at the time of their marriage she quit and then had only $300; that thereafter he supported her and the household. Confusingly, however, plaintiff testified also that about two years prior to her death his wife was mentally ill and that he obtained from her about $10,000 in cash, which one of the defendants had testified was brought to that defendant's home in 1953 by her mother and that thereafter plaintiff and her mother came by the house and picked up the $10,000 and other papers, including some bonds. Plaintiff said further that he and his wife had a joint safe-deposit box and a joint checking account at the time of her death and had had those during a portion or portions of their married life. He testified, over defendants' objection that he did not intend to make a gift of the property to his wife but put it in her name as a straw party until it could be remodeled and sold. Mr. Hampton contended that he had spent $6,000 to purchase the property and $3,225.71 in remodeling and upkeep, all but about $1,000 of which latter amount had been expended prior to his wife's death.

Mr. William Reid, who at the time of its purchase and continuously to trial time lived next door to the property in question, testified that during the period when plaintiff, as well as his wife Ollie, were working at the premises assisting in the remodeling and refurbishing, he became friendly and talked with them frequently. Because Reid's testimony and the total effect to be given it is important in our disposition, we set forth the most material portions in question and answer form.

"Q. When, after the house was purchased, did you have your first conversation with them? Have you any idea? A. I don't recall just when it was, but I talked to them after they purchased it. As I say, I don't know how long—

"Q. (Interrupting) To whom did you speak? A. I spoke to Mr. and Mrs. Hampton and I thought possibly they were going to move in there, and they said no, they didn't intend to live there, that they just bought it to resell.

"Q. Who were you talking to? A. Mr. Hampton. Mrs. Hampton, they were both present.

"Q. Where was it, in the house? A. No, it was outside in the back yard.

"Q. Do you recall when that conversation took place? A. No sir, I don't. It was shortly after they bought

the house, but we became quite friendly over a period of a couple of years, and Mrs. Hampton and I had a mutual interest. That is, flowers, gardening, and she helped me with different types and so on, and I got like both of them very well; and I tried to induce them to move in when I got them. I thought they would be very good neighbors and I recall that was about a year and a half after they bought the house. I asked them again if they wouldn't think about moving in. I would like to have them for neighbors, and they made the same statement that, you know, they didn't intend to move in, that they had their own home and just bought that to resell; they intended to finish remodeling that house and she had mentioned to myself in front of Mr. Hampton and also to my aunt who lives upstairs in my home, she's 78 years old; she also became friendly with Mr. and Mrs. Hampton, and she mentioned in our presence that the house was in her name, but it was Mr. Hampton's. He bought it. That was more than once. Now my aunt, she's not able to go out. She's semi-invalid. She has a heart condition, but you can obtain a statement from her any time to that effect. * *

"[Q] Within the first year this property having been bought in 1951 in November, you recall discussing with Mr. and Mrs. Hampton the fact they were both working so hard to get it fixed up? A. That's right.

"Q. Tell us what that conversation was about. A. Well, it was on the same lines that they were going to resell the house and they intended to rejuvinate, you know. It was pretty decrepit when they bought it. In fact, it was eyesore around there. It didn't look like it had had any paint for many years.

"Q. How long had you lived there? A. Seven years.

"Q. How long had you been there when he bought it? A. About a year.

"Q. The houses adjoin each other, with back yards adjoining each other? A. There is a fence in between, but, yes right next door.

"Q. You recall any conversations with Mr. and Mrs. Hampton about the fact he was working so hard there? A. There was one. That was about the second year, I suppose. She was talking to my aunt and I said before we were pretty friendly, and Mr. Hampton was inside, I don't know what he was doing; he was banging— we could hear him hammering. It was on a Sunday afternoon, so I kidded her. I said, 'Aren't you ashamed to let your husband work so hard like this? This is Sunday afternoon— never gets any time off.' She said, 'Well, he knew what he was getting into.' She said, 'I believe that he realized how much work there was to remodel this place.' She said, 'However, that is his worry. The house is in my name, but really it was his.' She said, 'I was what they call a Straw party, or something like that.' That's what she said in the presence of my aunt and myself. That was the one time.

"Q. Was that ever repeated during this two year period? A. No."

Mrs. Niehaus, one of the defendants, testified that prior to her mother's marriage to plaintiff her mother lived in an apartment which she rented from plaintiff and that for five years preceding her marriage her mother had sublet the upstairs portion and for the last three years prior to marriage had received $15 per week for that sublet portion; that the witness had been paying her mother $10 per week for board and room for three years prior to her mother's marriage; that her mother, prior to her marriage to plaintiff, worked at various places, including Mc-

Donnell Aircraft Corporation and Mangel's Department Store; that her mother helped plaintiff with his business after their marriage (plaintiff was a licensed electrician); that she knew her mother had some United States Savings Bonds at the time of her marriage to Hampton which may have been put in their joint names, and that approximately 1½ years after the marriage the witness saw a bundle of more than fifty $25 bonds; that her mother had no money or bonds at the time she died so far as the witness knew; and that the only things she and her sister had received were some of her mother's rings. Mrs. Niehaus further testified that some time in 1953 her mother came to witness's house with a bundle of money which she estimated to contain about $10,000 which remained in her home for about two days, whereupon she had called Mr. Hampton and he had come by and picked up her mother and the money; that her mother also had deeds and bonds with her at the time which were returned to plaintiff. She also testified that her mother had worked on the Theodosia house doing painting and various jobs in connection with its redecoration. Defendant Mrs. Cowan also testified that her mother worked in remodeling the house. Both daughters testified that they had not collected any rents and that no one had accounted to them for any rents at any time.

Defendants read into evidence some of the contents of a court file in a circuit court case entitled Mary Berdell Hampton v. Thomas J. Hampton, wherein plaintiff's former wife had been awarded a divorce and judgment for $75 a month alimony on May 23, 1947. It appeared that executions had been issued from time to time, some returned unsatisfied and others partially satisfied, and that in an affidavit filed in connection with a motion for a scire facias to revive the judgment, the plaintiff (in that suit) had sworn that on May 13, 1957, there was due by reason of that judgment $6,900 with interest from September 4, 1949. It appeared further that the present plaintiff (defendant in the revived proceeding) had filed an answer subsequent to the date of the filing of the affidavit wherein he had alleged that the judgment had been paid. Present defendants also read in evidence contents of the files in circuit court cases which showed garnishments issued in connection with the judgment in the divorce case, wherein Baden Bank had paid into court $116.98 on September 27, 1957, and the North St. Louis Trust Company had paid into court $149.84 on May 3, 1948, as a result of garnishments run in efforts to collect.

■ There are certain well-established principles which are applicable to this case. While, under some circumstances, when there is a transfer of property to one person and the purchase price is paid by another, a resulting trust arises in favor of the person who pays the purchase price, nevertheless, where a husband pays the purchase price and causes title to property to be transferred to his wife, a rebuttable presumption arises that the husband intended to make a gift to or a provision for the benefit of his wife. Rest., Trusts 2d, Vol. 2, §§ 440–442, pp. 393–403; Dallmeyer v. Dallmeyer, Mo., 274 S.W.2d 250, 254 [3–5]. The burden to prove that he did not intend to make a gift to or a provision for his wife was and is upon the husband, and the evidence adduced to rebut the presumption of gift must be strong enough to convince the trial chancellor in the first instance and this court on review that the husband did not intend that his wife have the beneficial interest in the property despite the fact that he caused legal title to be placed in her sole name. Warford v. Smoot, Mo., 237 S.W.2d 184, 186[2–4]. A resulting trust arises, if at all, by reason of facts which exist at the time title to the property is acquired and does not arise by reason of subsequent occurrences such as the expenditure by the husband of his money in improving the property, paying taxes, etc. Jacobs v. Jacobs, Mo., 272

S.W.2d 185, 189[11, 12]; Wenzelburger v. Wenzelburger, Mo.App., 296 S.W.2d 163, 166[8, 9]. But evidence, including parol evidence, of the husband's acts and conduct with reference to the property subsequent to the time of the acquisition of title may be admissible as tending to prove his intent at the time of the transfer. Rest., Trusts 2d, Vol. 2, § 443, p. 404.

■ Two questions to be resolved in determining whether a resulting trust arose at the time this property was transferred are, first, whether plaintiff did in fact pay for it with his own separate funds and, if so, whether plaintiff sustained his burden to prove that at the time he caused the property to be transferred to his wife he did not intend to make a gift of it to her. In determining those questions we review the record in this equity case de novo and reach our own conclusions as to the weight of the evidence, taking into account the trial chancellor's position to judge the credibility of the witnesses who testified before him. Peine v. Sater, Mo., 289 S.W.2d 101, 102[1–3].

In connection with plaintiff's testimony that he paid for the property with his own separate funds, it should be noted that he said his wife had only $300 at the time he married her; yet, according to other testimony, she had been working steadily prior to her marriage, had been receiving income from the subletting of rooms and from board paid by her daughter, and had some U. S. Bonds in her possession 1½ years after her marriage. Plaintiff testified also that he got $10,000 from his wife at the time described by the daughter as some time in 1953 and by plaintiff as some two years after the purchase of the house. It is true that plaintiff's testimony with reference to the $10,000 is not clear as to the source of that money, yet the fact remains that plaintiff did answer these questions as indicated:

"Q. Did you get it from your wife? A. I did.

"Q. How much was it? A. I don't recall the exact amount, somewhere in the neighborhood of $10,000.00.

"Q. Cash? A. Cash.

"Q. And that was when? A. That was just about two years before her death. She was mentally ill."

Now plaintiff did not testify that the $10,000 was the separate property of his wife at the time and it may have been their joint property or his separate property. The significant fact remains, however, that plaintiff did not clarify the source or ownership of that money and when that evidence is considered in the light of other evidence that plaintiff and his wife had maintained and had at the time of her death a joint safe-deposit box and a joint checking account, and that his wife helped him with his business during their marriage, it may be a reasonable inference that plaintiff and his wife, Ollie, had not handled money and property as constituting the separate property of one or the other but had treated the money from whatever source as theirs. At least, we may tentatively conclude that plaintiff's testimony, standing alone, that he paid for the property with his separate money is not convincing.

■■ As noted, plaintiff testified, over defendant's objection, that he did not at the time of the transfer intend to make a gift to his wife but intended that she hold title only until the property was resold. Defendants still contend that the court improperly admitted that testimony. While we agree with the trial court that the testimony was admissible where, as here, plaintiff's intent was material, Wigmore on Evidence, Vol. II, § 581, p. 714, et seq., Vol. VII, § 1965, p. 104, § 1967, pp. 107, 108, Steinger v. Smith, 358 Mo. 39, 213 S.W.2d 396, 398[1], Edie v. Coleman, 235 Mo.App. 1289, 141 S.W.2d 238, 246[13], still, in our view, such testimony, standing alone, is entitled to little weight. As we

have heretofore noted, the acts of plaintiff with respect to the property subsequent to the date of transfer were admissible as tending to show his intent at the time of transfer. We note, however, that the circumstances of acquisition and the subsequent acts of plaintiff with respect to the property, standing alone, and considered without reference to witness Reid's testimony, are as consistent with an intention to make a gift as they are with an intention not to do so. Plaintiff's evidence as to the circumstances of acquisition, for example, showed only that he and the grantor were present and that his wife was not present at the time the deed was executed by grantor, a circumstance as consistent with an intent to make a gift as with any other intent. Plaintiff's evidence as to his acts and conduct with respect to the property subsequent to the transfer of title to his wife was that plaintiff completely managed and controlled the property, supervised the remodeling and paid for it with his money, rented the property and collected the rents without accounting to his wife, paid the taxes, performed other similar acts, and once offered it for sale without consulting his wife; all of which tended to show that he was in exclusive management and control. That evidence, however, in one view, simply described a course of conduct which it would be perfectly natural for a husband to pursue with respect to property which he had given to his wife. Standing alone, the evidence with respect to those subsequent acts, taking into account the husband-wife relationship, was as consistent with gift as with another intent.

In connection with plaintiff's own testimony is the significant fact that he did not state, nor were there any circumstances shown in evidence surrounding the transfer giving rise to a legitimate reason for putting the title in the name of his wife if he did not intend to thereby give her the beneficial interest in the property. It is true that plaintiff testified he intended that his wife was to hold the property as

a straw party only until it could be remodeled and sold. But that self-serving testimony was not tantamount to an explanation of a reason for having failed to put the property in his own name to await remodeling and sale. Furthermore, plaintiff's evidence failed to show that it would have been improvident in any respect for him to have made a gift of the property to his wife.

Thus it is that the testimony of the witness Reid assumes great importance. If the trial chancellor gave, or if on this review we give, full credence to Reid's testimony, it, together with plaintiff's other evidence, although insufficient standing alone, sufficiently establishes that the purchase price was paid with plaintiff's own money and is sufficient to rebut the presumption of gift.

We have noted that defendants proceeded on alternative theories, viz., that there was no resulting trust, but even if so, plaintiff acted to defraud creditors and thus is entitled to no relief in equity. The trial chancellor made no findings which indicated the theory upon which he adjudged title in defendants. Inasmuch, however, as Section 510.310, subd. 2 RSMo 1949, V.A.M.S., provides in part that "All fact issues upon which no specific findings are made shall be deemed found in accordance with the result reached," it follows that the trial chancellor, in apparently finding the two fact issues (whether plaintiff paid for the property with his separate money and whether plaintiff sufficiently rebutted the presumption of gift) against plaintiff, must have rejected the testimony of the witness as to Ollie's alleged declarations and that rejection must have been based upon the chancellor's unexpressed finding as to Reid's credibility.

Of course, the trial chancellor had the opportunity not afforded us to observe the witness's appearance and demeanor, the manner in which he testified, and other characteristics which he may

have displayed. It often has been stated that "in reviewing such a case the appellate court is not bound by the trial chancellor's findings, but must review the cause by a trial *de novo,* weigh and evaluate the competent evidence introduced tending to prove or refute the essential factual issues and reach its own conclusions, usually giving deference, however, to the trial chancellor's findings where there is conflicting oral testimony involving a judging of the credibility of the witnesses who personally appeared before him." Meyer v. Meyer, Mo., 285 S.W.2d 694, 699[6–9]. It is to be noted that the foregoing rule as to deference is usually applied where there is conflicting oral testimony involving a judging of the credibility of witnesses. A corollary rule has been stated that we usually do not defer to the findings of the trial chancellor "where there is no conflict in the evidence and the witnesses are not impeached and there is no impeaching circumstance connected with their testimony." Plemmons v. Pemberton, 346 Mo. 45, 139 S.W.2d 910, 916[10, 11]. Of course, the finders of fact, the jury or the trial chancellor, may always take into account the demeanor of the witnesses on the stand in judging their credibility and thus the "witness' demeanor, * * * without any definite rules as to its significance, is always assumed to be in evidence." Wigmore on Evidence, Vol. III, § 946, p. 498. Consequently, the jury or the trial chancellor need not believe the testimony of any witness even though it is uncontradicted and unimpeached in any other manner. In determining, however, whether we, on a de novo review, should defer to the trial chancellor's apparent finding as to credibility, in this case we note and consider that there is no specific finding as to credibility, that there is no conflict in the oral testimony in the sense that one witness testified that plaintiff's deceased wife did make the declarations attributed to her and another witness said she did not, that the witness was not specifically impeached, and that we must assume that the trial chan-

cellor found for defendants on their no trust theory or on both their theories, rather than on their alternative theory only. That assumption is necessary because we have determined that defendants' evidence was insufficient to show that plaintiff's former wife was a judgment creditor at the time of the transfer of the property in question and thus plaintiff is not to be denied relief on defendants' alternative theory. Under the circumstances recited above, we think we should not defer to the trial chancellor's finding on credibility in this case unless our review of Reid's testimony as a whole demonstrates that there are matters and circumstances in connection with it which would justify our deferring to the trial chancellor's finding apparently based on the appearance and demeanor of the witness.

Under the circumstances that Ollie was deceased and could not testify, the only person, according to the witness Reid, who could have corroborated his testimony that the statements attributed to Ollie, since deceased, were made, was Reid's elderly aunt who, although it was explained that she was a semi-invalid, was available, but was not present at the trial and apparently no attempt was made to take her deposition or to explain the absence of her testimony. Mr. Reid testified that one of the two conversations with Ollie which he purported to relate had occurred about 1½ years after and the other about the "second year" after plaintiff and Ollie had acquired the house in question. The deed by which Mrs. Hampton acquired title was dated November 14, 1951, and 1½ years thereafter would have been about the middle of 1953. Ollie died on June 24, 1955, and plaintiff testified that the occurrence in which he obtained the $10,000 from his wife was about two years prior to her death when she was mentally ill, which would have been about the middle of 1953. Thus the statements attributed to Mrs. Hampton by Reid as verbal declarations indicating her husband's intent with respect to the transfer of the property were pur-

portedly made at about the same time that her husband said she was mentally ill and at about the same time that in some way or another there was a fund of about $10,000 of which Mrs. Hampton had possession and of which Mr. Hampton got possession.

Furthermore, Mr. Reid in the testimony we have heretofore set forth used language to describe his conversations with plaintiff and Ollie pertaining to the purchasing, owning, and refurbishing of the house indicating that the purchase and remodeling venture had been a usual husband and wife joint undertaking, rather than a situation in which the husband was acting independently with his own separate property. Reid testified: *they* said *they* just bought it to resell, *they* didn't intend to live there, it was after *they* bought the house, *they* intended to finish remodeling that house, *they* were both working hard to get it fixed up. Furthermore, the portions of the conversations in which Ollie purportedly made the statement to the effect that the property was his and not hers, and the statement in which she described her status as a straw party "or something like that," do not appear to have been natural or likely parts of the subject matter of the related conversations. It seems unusual that a wife would discuss technical matters of property ownership in apparently casual conversation with casual acquaintances.

■ Our review convinces us that Reid's testimony was such that its weight might well have depended upon his demeanor and appearance on the witness stand, things the trial chancellor was, and we are not, in a position to observe. We believe, therefore, that we should defer to the conclusion which the trial chancellor apparently reached with respect to the credibility of the witness's testimony. So deferring, and taking into account the deficiencies in plaintiff's testimony, heretofore noted, taking into account "that testimony as to verbal admissions of persons, since deceased, should be received with great cau-

tion. Ringo v. Richardson, 53 Mo. 385; and particularly so, when offered for the purpose of divesting a title created by deed. Johnson v. Quarles, 46 Mo. 423." Ellis v. Williams, Mo., 312 S.W.2d 97, 102[8], taking into account that a mere preponderance of evidence is insufficient to support the relief which plaintiff sought, but that the evidence to establish a trust by parol must be clear and convincing, Meyer v. Meyer, supra, 285 S.W.2d 699[6–9], and attaching particular significance to the fact that plaintiff did not explain why, if he did not intend a gift, he placed the title in his wife's name rather than holding title himself during the time the property was being remodeled, we have the opinion that plaintiff's evidence does not meet the required standard and is not clear and convincing that he paid the whole purchase price with his own separate money or sufficiently strong to rebut the presumption of gift.

■ The conclusion we have reached results in the view that defendants are entitled to an accounting of the rents collected by plaintiff since Ollie's death on June 24, 1955. In the light of our conclusion that Ollie received the title to the property at the time of the deed to her and that at her death title vested in defendants as her only heirs subject to plaintiff's dower therein, it follows that the money and labor expended on the property by plaintiff during the lifetime of his wife were necessarily for her benefit and under the evidence in this case, became part of the property or part of the gift to her. The expenditures made by plaintiff since his wife's death, however, either for taxes and insurance or for necessary or proper upkeep and repairs or other expenses necessary or proper to keep and maintain the house in condition so that it would remain readily rentable, should be credited to plaintiff in the accounting among the parties.

The judgment is affirmed and the case is remanded to the trial court to proceed

with the accounting and assignment of dower in accordance with the prior order of the trial court and in accordance with the views expressed herein.

HOLMAN, C., dissents.

HOUSER, C., dubitante.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.