Mary SHACKLEFORD and Helen Shackleford, Appellants,

v.

Thomas H. EDWARDS, Respondent.

No. 44592.

Supreme Court of Missouri.

Division No. 1.

May 9, 1955.

Schaumburg & Martin, W. H. Martin, Boonville, for appellants.

Roy D. Williams, Boonville, for respondent.

COIL, Commissioner.

Mary and Helen Shackleford have appealed from a judgment denying them relief in the nature of specific performance of an alleged contract between the Crawfords (husband and wife) to make irrevocable, mutual and reciprocal wills. We shall re-

fer to the parties as they were designated in the trial court.

Plaintiffs were the nieces of George K. Crawford, deceased. Frances H. Crawford, deceased, was George's wife and defendant, Thomas H. Edwards, was Frances's son by a former marriage. The Crawfords married when George was in his 50's. He had a strong dislike for his stepson. Plaintiffs had lived for many years as members of their Uncle George Crawford's household. Mr. Crawford owned as his separate property 250 acres of farm land; a portion of which was improved with a residence. Mrs. Crawford owned as her separate property a house in Bunceton, Missouri. In 1931 Mr. Crawford executed a note payable to Mrs. Crawford for about $11,000 secured by a deed of trust on the acreage mentioned, excluding the farmhouse and a plot of ground surrounding it.

Mr. Boyle G. Clark, a lawyer, represented Mr. Crawford some time in the 1930's in litigation in which Crawford was sued as director of the Bunceton bank. A few days prior to July 18, 1939, Mr. Clark was in Boonville, where the Crawfords were then living, and conferred with them on that and perhaps another occasion with respect to matters concerning their respective properties and the contemplated execution of wills. Mr. Clark apparently made a memorandum of the matters discussed and obtained from the recorder's office copies of two deeds (presumably deeds containing descriptions of the farm acreage and the Bunceton house). Apparently this memorandum was delivered by Mr. Clark to Mr. Peterson (Mr. Clark's law partner) and, as a result, Peterson drew reciprocal wills for the Crawfords and presumably drew some deeds. In any event, on July 18, 1939, Mr. and Mrs. Crawford were by prearrangement in Mr. Clark's office and at that time executed the wills which had been prepared by Mr. Peterson. At the same time Mr. Crawford executed a deed to the 250 acres and Mrs. Crawford executed a deed to the Bunceton house, each conveying their respective separate properties to Miss Rummell, a secretary in the Clark office. Miss Rummell immediately conveyed the farm and the Bunceton house to Mr. and Mrs. Crawford as husband and wife. The next day (July 19, 1939) Mr. Peterson released the farm deed of trust heretofore mentioned.

The wills were reciprocal in their provisions. Mr. Crawford devised and bequeathed to his wife all of his property, provided, however, that should she predecease him, the personal household effects which had been the property of Mrs. Crawford at the time of her marriage were bequeathed to her son, the defendant, and like personal effects which belonged to Mr. Crawford at the time of his marriage were bequeathed to his nephew, John Shackleford, and his two nieces, the plaintiffs (John Shackleford died in 1941 without heirs or descendants); and provided further, in the event Mrs. Crawford predeceased him, that one half the residue of his estate was devised and bequeathed to plaintiffs in equal shares, the other half to his stepson, Thomas H. Edwards, or, in the event defendant predeceased testator, to the descendants of Thomas H. Edwards, or, if none, then to Martha Frances Cooper, an adopted child of Mrs. Crawford's brother.

Mrs. Crawford's will contained the same provisions, i.e., she devised and bequeathed all of her property to her husband provided, however, that if he predeceased her, then her estate was to be disposed of exactly as provided in Mr. Crawford's will. Each named his spouse as executor and each named one Lon B. Wendleton as alternate executor.

Mr. Crawford died March 30, 1950. On May 10, 1950, the Cooper County Probate Court refused to administer on Mr. Crawford's estate for the reason that his property did not exceed in value the amount allowed by law to the widow as her absolute property. In the application for this order, the only property listed as belonging to Mr. Crawford was books, furniture, and bedding of no value, and a Plymouth automobile worth $400. In this connection we note that plaintiffs averred in their amended petition that pursuant to the alleged contract of irrevocability, certain personal property consisting of household goods, money,

bonds, other securities, and other chattels, the value of which plaintiffs did not know but which they alleged to be substantial, was by the joint action of the Crawfords vested in them as joint tenants with right of survivorship. Defendant denied this allegation and there was no direct evidence supporting this averment. There was testimony, however, which will be again referred to hereinafter, that Mrs. Crawford, after the death of her husband, stated that there was more money in the bank than she had expected and that she would be able to live comfortably without using the farm—that she would have cash and income sufficient to live.

On September 2, 1950 (about five months after her husband's death), Mrs. Crawford conveyed to defendant (her son) the farm and the Bunceton house reserving in herself a life estate, with the right to the full use and income during her life.

On December 1, 1950, Mrs. Crawford executed a new will in which defendant was sole beneficiary, and, in September 1952, executed a codicil thereto providing that her estate should go to a Kansas City hospital in the event her son predeceased her. Her former will (the July 1939 will) was destroyed by the attorney who drew the December 1950 will.

On October 29, 1951, Mrs. Crawford and defendant conveyed 40 of the 250 acres to Mr. and Mrs. Robien who paid $450 therefor by a check payable to Mrs. Crawford. On May 27, 1953, Mrs. Crawford and defendant conveyed the Bunceton house to Mr. and Mrs. Renken for $3,000 which was paid by several checks payable to Mrs. Crawford and her son and delivered when they both were present.

Messrs. Clark and Peterson testified that they had no independent recollection of the preparation and execution of the wills and the deeds but, in addition to the obvious fact that the wills and deeds were drawn by the Clark firm and executed there on July 18, 1939, the effect of their testimony was that neither had knowledge of an agreement, contract, or understanding between Mr. and Mrs. Crawford that they would not revoke the reciprocal wills and, thus, neither Mr. Clark nor Mr. Peterson made any attempt to so draw the wills or, by any other means, to give effect to such an agreement.

Mr. Wendleton, who, as noted, was named alternate executor in each of the wills and who, in addition, was the Crawford's long-time friend and neighbor, testified that shortly after Mr. Crawford's funeral he had some conversations with Mrs. Crawford at her request. Mrs. Crawford said to him "that when her and George finally agreed on what they were going to do with their property" they went to Mr. Clark's office and that he drew the wills for them, and she further said "they [Mr. and Mrs. Crawford] had a joint will, that her will was in line and I was named as Executor in it."

Mrs. Gladys Stevens, Mrs. Crawford's second cousin and a next-door neighbor, testified that Mrs. Crawford told her that she and Mr. Crawford were going to Columbia "to make a will and to fix up their property"; that upon their return from Columbia, Mrs. Crawford said that "they had decided together they would divide it half and half; Tom would get half and the Shackleford girls would get the other half."

Mary Chambers and her sister Ruth, who were plaintiffs' fourth cousins and Mr. Crawford's third cousins, visited Mrs. Crawford for 1½ or 2 hours shortly after Mr. Crawford's death. Mary Chambers testified that Mrs. Crawford said that she and George "had made a contract and joint wills * * * and she thought he couldn't have been better to have agreed to make these joint wills * * * that Mary and Helen would receive Cousin George's half * *. * and that her half would go to her son Tom * * * she told us that [three pieces of furniture from Crawford side of family] was Mary's and Helen's and * * * she said they just as well enjoy it now and she would like for them to have it at that time, because she didn't need it and then she repeated again that Cousin George had left more money in the bank than she thought he had and

that she was well provided for * * * she went over that time and time again about the property and that she would have enough and could live comfortably and she would have or at her death that this was to be divided this way * * * she was very much pleased that her property was fixed so that she wouldn't have to worry and that it would go where they wanted it to go. * * * and it would be carried out that way."

Ruth Chambers, relating Mrs. Crawford's statements in the same conversation, testified that Mrs. Crawford "told us that they had fixed their property, she and Cousin George and that they had made their wills and had fixed a contract so at her death her property would go to Tom, her son, and his property would go * * to these Shackleford girls at his death or the one that survived it would go to and she said she thought it was just wonderful in Cousin George to have made these * * * willing to fix the property as they had fixed it * * * to leave Tom half and the girls half, * * * and she told about the furniture * * * the Crawford's half, was to go to the Shackleford girls, the other half was to go to Tom * * * and how happy she was that Cousin George had fixed things before he passed away: that she felt she would have plenty to live on and she had quite a bit; * * * in the bank, really more than she had supposed George * * * had there * * *."

Mrs. Crawford delivered to plaintiffs the three pieces of antique furniture which were referred to in the above-noted conversation.

■ In reviewing this case de novo we weigh the evidence and reach our own conclusions as to its weight, taking into consideration the trial court's position to judge the credibility of witnesses. Hart v. Hines, Mo.Sup., 263 S.W.2d 13, 14 [1].

It is at once apparent that if these reciprocal wills were made pursuant to a contract between Mr. and Mrs. Crawford to execute mutual wills which were to remain unrevoked, the provisions for the final disposition of the property were, under the circumstances, fair and equitable, and that the contract, if any, was based upon a sufficient consideration. So that the decisive question is whether plaintiff's evidence was sufficient to convince us that these wills were executed pursuant to a contract to make irrevocable mutual wills and, if so, whether the wills were to affect real estate held by the husband and wife in an estate by the entirety.

■ In Plemmons v. Pemberton, 346 Mo. 45, 54, 139 S.W.2d 910, 916, the applicable law governing the present facts is stated: "Consequently, the mere fact that the two wills * * *, upon their face, purport to be reciprocal and mutual wills and contain similar or identical provisions and that they were drawn by the same scrivener, executed at the same time and before the same witnesses, with full knowledge, on the part of each testator, of the contents of the other will, and were clearly made for the accomplishment of a common purpose, although such circumstances are to be regarded as some evidence that they were made in pursuance of an agreement (Wallace v. Wallace, 71 Misc. 305, 130 N.Y.S. 58), is not sufficient evidence of a contract to make wills to remain unrevoked at the deaths of the testators. 69 C.J. pp. 1304, 1305. Even the fact that the evidence (other than the wills themselves) may show that the wills were made pursuant to *some* agreement is insufficient. An agreement to make reciprocal and mutual wills is performed when the wills are made. Howells v. Martin, 101 N.J.Eq. 275, 278, 137 A. 565; Beveridge v. Bailey, supra [53 S.D. 98, 220 N.W. 462, 60 A. L.R. 619]. The agreement to be enforcible must be to dispose of the property as therein provided, or not to revoke such wills; that the wills shall remain in force at the death of the testators. 69 C.J. p. 1300.

■ "However, as before stated, it is not necessary that the agreement be established by direct evidence. If the contract does not expressly appear in the language of the wills, the agreement 'may be supplied by competent witnesses who tes-

tify to admissions of the testators, or an express promise may be shown, evidence is also admissible of such facts and circumstances, and such relations of the parties, as to give rise to an implication that such an agreement was made, and such implication may have reinforcement from evidence of the conduct of the parties at the time of making the wills, and subsequently. Thus for the purpose of showing that reciprocal wills were intended to be mutual, evidence may be admitted of facts tending to show that each of the parties acted, in making his will, with the knowledge of the other, that the two wills were drawn by the same person, at the same time, and at the joint request or directions of both parties, and * * * that they were in fact executed in pursuance of a common purpose and understanding.' 69 C.J. p. 1034."

In the instant case Mr. and Mrs. Crawford, in making their wills, obviously acted with the full knowledge of each other. The wills were drawn by the same scrivener at the same time, executed at the same time, apparently before the same witnesses, and it would seem were made to accomplish a common purpose. The instant wills themselves are, therefore, some evidence that they were mutual wills made pursuant to an agreement that they were to remain in force at the death of the testators. This evidence, however, standing alone, is not sufficient to prove that the parties did in fact agree that their property was to be ultimately disposed of as provided in the survivor's will. In this particular case, however, the facts which appear from the wills themselves, from their reciprocal provisions, and from the manner and mode of their execution, constitute significantly strong evidence of the existence of a contract between Mr. and Mrs. Crawford not to revoke those wills. This, because of the particular circumstances of this husband and wife. Mr. Crawford had apparently been a bachelor. In 1917 he married Mrs. Edwards who was a widow and the mother of two grown sons by a former marriage. (Defendant Thomas H. Edwards was her only surviving son at all the times herein pertinent.) Mr. Crawford owned a farm. Mrs. Edwards owned a house in town. Sometime during their marriage Mr. Crawford formed an intense dislike for his stepson. It is apparent from the evidence that Mr. and Mrs. Crawford, prior to July 1939, must have discussed the disposition to be made of their separate properties. It is also apparent that, as a result of these discussions, they conferred with Mr. Clark, and that the wills and the deeds were executed as part of an overall plan to carry out a common purpose. To accomplish what they wanted to do, they placed their separate properties in an estate by the entirety. They executed wills which, if unrevoked, would, at the survivor's death, have divided this entirety property equally between Mr. Crawford's closest relatives (to whom he had been particularly close) and Mrs. Crawford's only surviving son. Now this was the kind of an arrangement which would be expected under these facts—one which unerringly bespeaks the prior existence of an agreement that the disposition then agreed on would be the final ultimate disposition of their separate properties, and one which would be most unlikely in the absence of such a definite agreement.

We are convinced that the circumstances of Mr. and Mrs. Crawford and the wills themselves give rise to an implication that Mr. and Mrs. Crawford did contract not to revoke these wills. This strong inference, insufficient standing alone to prove the existence of such a contract, is reinforced and supplemented, and in our judgment, convincingly so, by the statements and conduct of Mrs. Crawford after her husband's death.

Mrs. Crawford told Mr. Wendleton that after she and her husband had "finally agreed" on what they were to do with their property they executed these wills and she described the wills as "a joint will." She told Mrs. Stevens that she and her husband had "decided together" that the property would go half to the defendant and half to the plaintiffs. She told the Chambers sisters that she and her husband had made a "contract and joint wills" whereby plain-

tiffs would receive her husband's half and her son would receive her half and that the property was fixed so it "would go where they wanted it to go * * * and it would be carried out that way"; that she and her husband had "fixed a contract" so that at the death of the survivor it would go half to the plaintiffs and half to defendant. And Mrs. Crawford, as indicatory of a contractual obligation, actually transferred a portion of the furniture which had come from the Crawford side of the family to the plaintiffs prior to her death for the stated reason that they "might as well enjoy it now."

We are of the opinion that Mrs. Crawford's statements made shortly after her husband's death are convincing evidence of the fact that wills were made pursuant to a contract not to revoke them. Thus, when the wills themselves are considered in the light of the circumstances of the parties, there is an implication that there was an agreement not to revoke, and when this implication is reinforced by the evidence of Mrs. Crawford's statements and conduct after her husband's death, we think it has been proved by convincing evidence that the Crawfords agreed to ultimately dispose of their property in accordance with the provisions of the survivor's July 1939 will.

Now the same evidence which convinces us that there was a definite agreement between the Crawfords to make mutual irrevocable wills also convinces us that those wills were to provide for the ultimate disposition of their separate properties which simultaneously were placed in an estate by the entirety. And, in this connection and in addition to the circumstances and evidence heretofore mentioned, it appears that there was at least considerable money, and there must have been other personalty, on hand at Mr. Crawford's death. The evidence indicates that it was not Mr. Crawford's property at the time of his death. It is a most reasonable inference, therefore, that the money and other personalty on hand had been the property of Mr. and Mrs. Crawford as joint tenants. Consequently, it would appear

that the real estate held by the entirety was at least part of the property which Mr. and Mrs. Crawford agreed was to be finally disposed of by the terms of the survivor's will. In other words, it seems that the only substantial property the wills could affect was that held jointly by the Crawfords.

It is true that ordinarily a will does not affect property held in an estate by the entirety. It is also true, however, that a husband and wife acting jointly may agree upon the ultimate disposition of their entirety property. Stewart v. Shelton, 356 Mo. 258, 264 [2], 201 S.W.2d 395, 398 [7] [8, 9].

In weighing the evidence and in reaching the conclusion that it is convincing of the fact that Mr. and Mrs. Crawford had an agreement as to the final distribution of this entirety property which was to be effected by the survivor's will, we have not overlooked the fact that the Crawfords' lawyers who drew the wills were unaware of any agreement not to revoke. It may be that this circumstance is some evidence that no such agreement existed because of the seemingly natural expectation that, if an agreement existed, the parties would have advised their lawyers of it. However, in view of the fact that the lawyers did not remember, and, of course, could not be expected to have remembered, the conversation that occurred prior to and at the time of the execution of the will, we may not reach a satisfactory conclusion as to the significance of the mentioned circumstance. We may not know that the matter of the existence of any agreement between husband and wife as to irrevocability was discussed or suggested in the negotiations with their lawyers. In any event, we are of the opinion that the circumstance (that the Crawfords did not advise their lawyers of their agreement) is outweighed by the other evidence in the case and is insufficient to overcome the convincing evidence that a contract or an agreement was made between this husband and wife as to the final dis-

782

tribution of what had been their separate properties.

Mrs. Crawford was bound under the contract with her husband not to revoke the mutual will executed by her on July 18, 1939. Her voluntary conveyance to her son of the involved property for $1 and love and affection constituted a violation by her of that contract. Under the circumstances of this case equity will enforce the contract by ordering the cancellation of the deed of September 2, 1950, from Mrs. Crawford to Thomas H. Edwards, and by adjudging that each plaintiff is an owner of an undivided one-fourth interest, and that defendant is the owner of an undivided one-half interest in the 210 acres of farm land (i. e., the 250 acres involved less the 40 acres conveyed to the Robiens).

Plaintiffs contend that they are entitled to a lien on defendant's undivided one-half interest in the 210 acres in an amount equal to one half the amounts received on the sale of the Bunceton house and the 40 acres. We are of the opinion that plaintiffs failed to adduce evidence showing themselves entitled to this relief. As we have noted heretofore, the 40 acres were sold in October 1951 by Mrs. Crawford and defendant to the Robiens for $450. The Robiens paid by a check to Mrs. Crawford. The Bunceton house was sold in May 1953 by Mrs. Crawford and her son to the Renkens for $3,000. The Renkens paid by checks jointly to Mrs. Crawford and defendant, delivered when "they were both present." There was no evidence whatever as to the disposition of the $3,450 proceeds from these sales. Mrs. Crawford may have expended the money for necessities (if so, such use by her was not necessarily inconsistent with the provisions of the mutual wills). There was no evidence as to what personal property Mrs. Crawford owned at her death. Thus, we may not determine from any evidence in the case that plaintiffs are entitled to a lien on defendant's undivided one-half interest in the 210 acres.

It follows that the judgment is reversed and the case remanded with directions to enter a judgment in accord with this opinion. Defendant is to pay the costs on this appeal.

VAN OSDOL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur except WESTHUES, J., not sitting.