Sarah M. Grim WIMP et al., Plaintiffs-
Respondents,

v.

H. Gordon COLLETT, Executor of the Estate
of Hubert L. Collett, Deceased
et al., Defendants,

Edna Alice Palmer Hughes et al.,
Defendants-Appellants.

No. 52284.

Supreme Court of Missouri,
Division No. 1.

April 10, 1967.

Jayne, Oswald & Cottey, Kirksville, for plaintiffs-respondents.

Ely & Cary Hannibal, for defendant, H. Gordon Collett, individually and as Exr. of Estate of Hubert L. Collett, Decd.

J. Andy Zenge, Jr., Dennis W. Smith, Canton, Robert H. Renaud, McKesson, Renaud, Cook & Miller, Phoenix, Ariz., for appellants.

HIGGINS, Commissioner.

Appeal from judgment specifically enforcing an oral contract between Dr. Edward A. Grim and Effa Alta (Allen) Grim, husband and wife both deceased, to make testamentary disposition of their property, including real estate, one half to collateral heirs of Dr. Grim and one half to collateral heirs of Mrs. Grim. Respondents (plaintiffs) are the collateral heirs of Dr. Grim and appellants (defendants) are the collateral heirs of Mrs. Grim. Title to real estate is involved.

Edward A. Grim was born August 25, 1867, and, during his adult life, was a practicing medical doctor in Kirksville, Missouri; Effa Alta Allen was born March 30, 1874, and, prior to her marriage, was a schoolteacher. On June 24, 1915, these parties were married; he was then 48 and she was 41 years of age. Neither had been previously married and both were, and remained, childless.

Prior to this marriage Dr. Grim had acquired a 5-acre residential property (the home place), a business building, and a half interest in another business building, all at Kirksville, Missouri. Mrs. Grim owned no real property prior to her marriage. After the marriage Dr. Grim took title in his own name to 108 acres in Adair County in 1922, to 220 acres in Adair County in 1925, to a small triangular tract in Adair County in 1922, and to another small tract in Adair County in 1926. Dr. Grim conveyed none of his property except for a 6.8-acre tract in Adair County in 1922.

On May 6, 1929, Dr. and Mrs. Grim executed and published their joint will:

"Know ALL MEN BY THESE PRESENTS, That we, Edward A. Grim, and Effa Alta Grim, husband and wife, of Kirksville, Missouri, both being of sound mind and disposing memory, do make, publish and declare this instrument to be, jointly as well as severally, our last will and testament, hereby revoking all former wills by us made.

"First.—We direct that all of our just debts, including funeral expenses and expenses of last illness, be first paid.

"Second.—After the payment of said debts, all of our property, both real and personal, of which we may be possessed at the time of the decease of either of us, shall be held by the survivor during the period of his or her natural life, such survivor to have the right to use the same as he or she shall see fit, except that such use shall not be construed at any time to mean that the survivor shall have the right to sell any of the real estate owned by either of us at the date of death. Such survivor, however, shall have the right to all rents and profits derived from said property.

"Third.—All of the rest, remainder and residue of our property, both real, personal and mixed, and wherever situate and existing at the date of the death of the survivor, and not paid out as hereinabove provided, we give, bequeath and devise as follows, to-wit:

"One-half thereof, share and share alike, to the brothers and sisters of the undersigned Effa Alta Grim living at the date of the demise of the survivor, who are as follows: Levi Allen, Memphis, Missouri; Peter R. Allen, Memphis, Missouri; Grover C. Allen, Kansas City, Missouri; and Mrs. Cora I. Palmer, Humansville, Missouri; the remaining one-half, share and share alike, to the brother and sister of Edward A. Grim living at the date of the demise of the survivor, who are as follows; to-wit: Ezra C.

Grim and Emma J. Collett, of Adair County, Missouri; and should any of the above named brothers or sisters predecease the survivor, then and in that event the share that would have gone to such brother or sister had they been living shall descend to the children or heirs of such deceased brother or sister.

"In case of administration hereon at the decease of one of us, then we agree that the survivor is appointed executor or executrix of this will, to act without bond. Upon the death of the survivor we direct that Warner Mills be appointed executor of this will.

"IN WITNESS WHEREOF, We have hereunto set our hands on this the 6th day of May, 1929.

"s/Edward A. Grim
"s/Effa Alta Grim

"The foregoing instrument was, at the date thereof, signed and declared by the said Edward A. Grim and Effa Alta Grim to be their last will and testament, in the presence of us, who, at their request and in their presence, and in the presence of each other, have subscribed our names as witnesses thereto.

"s/W. F. Murrell of Kirksville, Missouri
"s/Nellie R. Mock of Kirksville, Missouri
"s/J. B. Elmore of Kirksville, Missouri"

At the time of trial W. F. Murrell lived in St. Louis and Nellie R. Mock and J. B. Elmore were dead. Charles Murrell, a practicing attorney in Kirksville, prepared the will and he, too, was dead at the time of trial.

Dr. and Mrs. Grim acquired other real property as tenants by the entirety subsequent to execution of their will. In 1933 they acquired 407 acres in Knox County known as the Childress farm identified by a round red barn; in 1934 they acquired an additional 400 acres in Knox County known as the Meilicke farm, and the Shepherd Shoe Store building in Kirksville; in 1935 they acquired an 80-acre tract in Knox County and 400 acres in Adair County.

Dr. Grim died February 17, 1936, and the 1929 joint will was admitted to probate in Adair County. Mrs. Grim qualified and served as executrix and, at the close of administration, made distribution of property according to the terms of the will. In her own right Mrs. Grim made no renouncement but took the provision made for her in the will. Included in the property then distributed was real estate owned by Dr. Grim in his own name appraised at $33,194 which, upon termination of Mrs. Grim's life estate, less a portion condemned by Northeast Missouri State College, was sold in partition for $105,500 which was distributed one half to Dr. Grim's collateral heirs and one half to Mrs. Grim's collateral heirs.

On August 24, 1959, Mrs. Grim, then 85 years of age, executed a second will giving the Adair County real estate and half of the residue, valued in the aggregate at $48,113.78, to Dr. Grim's heirs, and giving the Knox County real estate, personal property, and half the residue, valued in the aggregate at $217,992.68, to her side of the family. In addition, Dr. Grim's heirs were to be charged with all federal and state estate and inheritance taxes. (Respondents' brief contains a statement unrefuted by appellants, that $74,376.63 federal estate taxes alone have now been paid, with state inheritance taxes yet to be assessed.)

Mrs. Grim died September 8, 1963. Her 1959 will was admitted to probate and letters testamentary were issued to Cecil Darr, the executor named in the 1959 will.

This suit was instituted June 15, 1964, for a declaration: that an enforceable contract existed between Dr. and Mrs. Grim to make an irrevocable will disposing of all their property, and that the 1929 will was executed pursuant to that agreement; that by virtue of that oral contract, the 1929 will could not be revoked; and for specific performance of the oral contract.

The court found that the evidence, all of which came from plaintiffs, established the pleaded oral contract between Dr. and Mrs.

Grim to make testamentary disposition of all their property, and decreed specific performance of that agreement to the end that one half of all such properties go to Dr. Grim's collateral heirs and one half to Mrs. Grim's collateral heirs. (The decree computed the specific shares of each such heir under the 1929 will.)

The first question posed by appellants' first assignment of error is whether plaintiffs presented "clear, cogent and convincing" evidence sufficient to establish that Dr. and Mrs. Grim entered into an irrevocable contract covering the disposition of their property after their deaths as found by the court.

■■ Much of the applicable law may be found in Plemmons v. Pemberton, 346 Mo. 45, 139 S.W.2d 910, 915–916 [3, 4] [8, 9]:

"The rule is well stated in Clements v. Jones, 166 Ga. 738, 742, 743, 144 S.E. 319, 322, as follows: 'The general rule is, although not undisputed, that if two persons execute wills at the same time, either in one or two instruments, making reciprocal dispositions in favor of each other, the mere execution of such wills does not impose such a legal obligation as will prevent revocation. By the weight of authority agreements to make wills are not established merely because two persons make some reciprocal testamentary dispositions in favor of each other; the language of such wills containing nothing to the effect that the instruments are the result of a contract. The case is different, however, where the mutual wills are the result of a contract based upon a valid consideration, and where, after the death of one of the parties, the survivor has accepted benefits under the will of the other which was executed pursuant to an agreement. In such cases, where all the facts are fully proven, equity will interpose to prevent fraud. * * * However, to enable one to invoke the intervention of equity, it is not sufficient that there are wills simultaneously made, and similar in their reciprocal provisions, but

the existence of a clear and definite contract must be alleged and proven, either by proof of an express agreement, or by unequivocal circumstances.' * * *

"As to the nature of evidence necessary to establish an agreement of the kind in question, it was stated in the leading case of Edson v. Parsons, 155 N.Y. 555, 567, 568, 50 N.E. 265, 268:

■ "'* * * It is not essential to the intervention of equity, in order to prevent the accomplishment of fraud, that an agreement should be established by direct evidence. It may be established from such facts and circumstances as will raise an implication that it was made, and may have reinforcement from the evidence of the conduct of the parties, at the time and subsequently. But, concerning as it does the statutory right of a person to dispose of his property after his death by a last will, the court should refuse to interfere unless the agreement depended upon for the award of the relief demanded has been clearly and definitely established. The law permits a person to dispose of his property at his pleasure. He may make a valid agreement, binding himself to make a particular testamentary disposition of his property, if it be a reasonable one, and he may validly renounce the power to revoke his will, in the absence of fraud or deceit. Equity will enforce such an agreement, when well and fairly founded, and will not suffer him to defraud and to defeat his obligation by another will. But the court must have full and satisfactory proof of the agreement. * * *

■ "'A general maxim which equity recognizes is that a testator's will is ambulatory until his death. It is a disposition of property which neither can nor is supposed to take effect until after death. I think it needs no further argument to show that to attribute to a will the quality of irrevocability demands the most indisputable evidence of the argeement (sic) which is relied upon to change its ambulatory nature,

and that presumptions will not, and should not, take the place of proof.'

"In Wanger v. Marr, 257 Mo. 482, 493, 165 S.W. 1027, 1031, it is stated: 'While direct evidence of the existence of such a contract is not indispensable, yet the contract must be proved by evidence measuring up to the standard fixed by the authorities cited [including Edson v. Parsons, supra] and principles adverted to in the preceding paragraph.' * * *

■ "However, as before stated, it is not necessary that the agreement be established by direct evidence. If the contract does not expressly appear in the language of the wills, the agreement 'may be supplied by competent witnesses who testify to admissions of the testators, or an express promise may be shown, evidence is also admissible of such facts and circumstances, and such relations of the parties, as to give rise to an implication that such an agreement was made, and such implication may have reinforcement from evidence of the conduct of the parties at the time of making the wills, and subsequently. Thus for the purpose of showing that reciprocal wills were intended to be mutual, evidence may be admitted of facts tending to show that each of the parties acted, in making his will, with the knowledge of the other, that the two wills were drawn by the same person, at the same time, and at the joint request or directions of both parties, and, even though their dates differ slightly, that they were in fact executed in pursuance of a common purpose and understanding.' 69 C.J. p. 1034."

■ As to joint wills specifically, "the simple fact that husband and wife executed a single instrument as their will is evidence of an agreement, but, alone, is not conclusive." Wanger v. Marr, 257 Mo. 482, 165 S.W. 1027, 1030 [3].

■ The circumstances previously stated show that Dr. and Mrs. Grim were married in their 40s and were childless.

They executed a joint will in 1929 at a time when considerable real estate had been acquired by, and stood in the name of, Dr. Grim alone; Mrs. Grim owned no real property. Each of them had similar collateral relatives consisting of brothers and sisters who, absent the existence of children, would ordinarily be the natural objects of such persons' bounty. That is to say, it would be reasonable to infer that Dr. Grim would wish to provide for his collateral heirs and Mrs. Grim would tend to favor her family. It was in that situation that Dr. and Mrs. Grim had a practicing lawyer to prepare the will which they executed jointly May 6, 1929, a situation similar to that in Shackleford v. Edwards, Mo., 278 S.W.2d 775. The testators there also were husband and wife. The husband was a bachelor in his 50s when he married his wife who had a child by former marriage. Each owned separate real estate. They executed separate reciprocal wills and devised all their real property to each other and, upon the death of the survivor, the estate was to go one half to the wife's son and one half to the husband's collateral heirs. The husband died first and the wife thereafter conveyed the property all to her son to the exclusion of the husband's heirs. A suit for specific performance of the contract which gave rise to the wills, instituted by the husband's heirs, was successful. A paraphrase of the circumstances and logic in that case is in point here. Dr. and Mrs. Grim were both educated adults and, in making and publishing their joint will, obviously and necessarily acted with the full knowledge of each other. Their single instrument joint will was drawn by a single scrivener, learned in the law; it was executed at the same time before the same witnesses, and was intended to accomplish a mutual or common purpose, i. e., that of providing for each of the testators during their lives and thereafter to benefit their respective families in equal shares. The will itself, then, being joint and mutual, is some evidence under the rules that it was made pursuant to an agreement that it was to remain in force after the death of the testators. Certainly, it would be illogical to suggest that such a comprehensive scheme came into being *ipso facto*. Of course, this alone is not sufficient to prove that the parties did in fact agree that their property was to be ultimately disposed of as provided in the joint will, but the circumstances provide additional strong evidence of a contract not to revoke this joint will. In order to have such a will drawn and to execute it, the parties necessarily had to discuss the disposition they intended to make. Having reached a decision on disposition, they then conferred with their lawyer and obtained the drafting of an instrument representative of their common purpose and scheme and executed it for the accomplishment of that purpose. "Now this was the kind of arrangement which would be expected under these facts—one which unerringly bespeaks the prior existence of an agreement that the disposition then agreed on would be the final ultimate disposition of their separate properties, and one which would be most unlikely in the absence of such a definite agreement." Shackleford v. Edwards, supra, 278 S.W.2d l. c. 780 [7].

This evidence of an express contract is reinforced by specific language in the will indicative of the intent of the testators to be jointly and irrevocably bound. Reference to the will shows that " * * * *we* * * * *both* * * * declare this instrument to be, *jointly as well as severally, our* last will * * * '* revoking all former wills by *us* made. * * * *We* direct that all of *our* just debts * * * be first paid. * * * *all of our* property * * * of which *we* may be possessed *at the time of the decease of either of us,* shall be held by the survivor during * * * *his or her* natural life * * *. *All* of the rest * * * of *our* property * * * at the * * * death of the *survivor* * * * *we* give * * * one-half * * * to the brothers and sisters of * * * Effa Alta Grim living at the *date of the demise of the survivor,* * * * one-half * * * to the brother and sister of Edward A. Grim living *at the date of the demise of the sur-*

*vivor* * * *. In case of administration * * * *we agree* * * *. IN WITNESS WHEREOF, *We* have * * * set *our* hands * * *." Such recitals are similar to those of the joint will in Glueck v. McMehen, Mo.App., 318 S.W.2d 371, where it was said: "* * * the facts which appear from the will, itself, from the reciprocal provisions, and from the manner and mode of its execution, constitute significantly strong evidence of the existence of a contract between (husband and wife) not to revoke this will." 318 S.W.2d 1. c. 376 [5]. "The agreement * * * as expressed in the will became irrevocable after the death of (husband) and (wife) had no right to give away a valuable tract of land. To hold otherwise would be to hold that the survivor could nullify the agreement written into the joint will while both were alive." 318 S.W.2d 1. c. 377 [7].

◼ Drawn as it was, and in the circumstances of this case, the 1929 will of Dr. and Mrs. Grim was, as in Stewart v. Shelton, 356 Mo. 258, 201 S.W.2d 395, 400 [13], "eminently fair and just and was without preference to any person or either set of brothers or sisters. Certainly the mutual promise of each testator to the other testator that his or her brothers and sisters should have an equal share and only an equal share with the brothers and sisters of the other testator was sufficient consideration for the mutual agreement. Neither could know at the time the will was made which one of them would be first deceased. The promise of one with its resultant benefits to inure to the brothers and sisters of that one was consideration for the promise of the other, with benefits likewise to inure. The evidence shows a mutual interest of the two testators in all the beneficiaries under the will. That the agreement between (husband) and (wife) was certain as to its terms and subject matter is supported by the oral testimony and by the joint will itself."

In addition to the background and circumstances previously detailed and the joint will itself, there was also oral testimony here which bore on the existence and nature of the contract between Dr. and Mrs. Grim. Louis McBride was a long-time Knox County resident, 78 years of age, engaged in livestock raising and grain farming. He had known Dr. Grim for a considerable time but "didn't know her until I had business with the two of them." He helped the Grims, apparently as an agent, to purchase the Meilicke farm and sold them the Childress farm identified as having a distinctive big red barn. "It's plum round— it's just as round as it can be." Mr. McBride farmed the lands for several years after the purchase for Dr. and Mrs. Grim, and for Mrs. Grim after the doctor's death until 1948.

"Q. Now, Louis, at the time you started doing business with the Doctor, did you have any conversations with his wife, Effa Alta Grim, concerning any contract or will which she and the Doctor had made? * * * A. I did.

"Q. * * * What did she say about any will or contract she had with the Doctor? A. Well, Mrs. Grim said that she had a contract and a will that this land I sold her was, or it was in a joint deed, and that she and he both wanted me to kind of look after it and see that each one got their share of the, half and half of the will, that it should be divided that way.

"Q. Divided half and half to whom? A. To Dr. Grim and to Mrs. Effa Grim.

"Q. During the years that you farmed this land, after the Doctor died, did you ever have any other conversations with her about this? A. Well, yes, she talked to me about it, to see that it was that way, that she wanted the contract— * * * She said that she wanted me to see that the will went just like they contracted it to go, to be divided half in their family and half in her family. * * *

"Q. At the time you settled up with her (Mrs. Grim), in 1948, just tell the Judge what it was she told you, just what she said

about her Knox County land? A. She said that it was—she told me that—

"Q. Let me ask you this—did the subject matter come up about selling it? A. Yes.

"Q. All right. And what did she say in that connection? A. She said she couldn't sell it because it was in a contract in their will and according to that, she couldn't sell the land—it had to be divided up equally unless she needed the money to live on.

"Q. All right. Did you have a buyer for her at that time? A. I had a buyer for her.

"Q. And who was that fellow? A. Roy Keyes of Chicago. He wanted me to buy him a big farm."

Upon cross-examination, Mr. McBride was asked:

"Q. When was it that you had the next (after 1933) conversation with her in which you say she made some statement about wanting you to see that she got half of the property and he got half of the property? A. There was a good many times after that that she said that * * *.

"Q. So you had one conversation after you sold the farm and then another conversation was after the, or when you were settling up in 1948, is that correct? A. Well, and in between that a lot of times she talked about it.

"Q. Mr. McBride, isn't it a fact that Mrs. Grim didn't discuss business affairs with anybody, as far as you know, did she? A. She did with me pretty often."

Upon further cross-examination in respect to termination of their farming agreement, Mr. McBride was asked:

"Q. And that's when she said that she wanted you to see that the contract was carried out, is that your testimony? A. That's when she told me again, yeah."

Joseph S. Miller was a retired special agent and adjuster for 36 years with Hartford Fire Insurance Company. He adjusted some losses for Mrs. Grim on the Knox County premises, particularly on the farm with the round barn. On September 13, 1936, he met with her to "settle the loss and present her with the proof of loss. * * * When I presented Mrs. Grim with this proof of loss, I said to her: 'Mrs. Grim, I am submitting you a proof of loss but we must insert the names of the heirs mentioned in the joint will.' * * * She said, 'I know about that joint will, and I know I have it my lifetime, then it goes to our heirs, but I don't want their names in that draft.' "

Charles F. Gardner had been in the insurance business for about 40 years. He first insured the Knox County buildings for Mrs. Grim "shortly after Dr. Grim died."

"Q. * * * Now in connection with your insurance business and the insuring of these buildings, did you ever discuss with Effa Alta Grim the title or a will that she had in effect, a joint will with her husband? Did you ever discuss that with her during those years? A. We talked about her title to the property.

"Q. What did she tell you in connection with the title that she had to that property? A. She said she had a life interest in it.

"Q. Did she tell you anything about who was to take that property after she was gone, died? A. It was to be divided between her family and Dr. Ed's family. * * *

"Q. Now, did she ever say anything to you in any of these conversations about her right to dispose of that Knox County land? A. Yes, she did. Q. What did she say? A. She said that she had only a life interest in it, then it was to go to the families."

Mr. Gardner also identified two applications made by Mrs. Grim for insurance on the Knox County properties. In each in-

stance the applicant's title was shown as "life estate." "Many times we went over her title."

"Q. All right. What did she tell you? A. She told me she had only a life interest in it. The application shows only a life interest."

Mrs. Grim did not at any time after Dr. Grim's death voluntarily convey or mortgage any of the Adair or Knox County real estate.

Appellants argue that such testimony is "far from being the clear, definite and unequivocal proof" relied upon by the court in finding an agreement not to revoke in Shackleford v. Edwards, supra; however, a comparison shows the testimony in the two cases to be similar. The pertinent testimony in that case is summarized at 278 S.W.2d l. c. 780–781 [7] : Mrs. Crawford, the surviving widow, told a Mr. Wendleton that she and her husband had "finally agreed" on what they were going to do with their property and executed "a joint will." She told a Mrs. Stevens that she and her husband had "decided together" and that the property would go half to the defendant and half to the plaintiffs. She told the Chambers sisters that she and her husband had made a "contract and joint wills" whereby plaintiffs would receive her husband's half and her son would receive her half. She and her husband had "fixed a contract."

Another matter recognized by the cases as indicative of the existence of a contract between two testators is the survivor's acceptance of benefits and provisions under the contract and will. Plemmons v. Pemberton, supra, 139 S.W.2d l. c. 915 [4]. There the court enforced an oral contract between bachelor brothers who, as testators, executed two reciprocal wills in 1916. One brother died in 1932, his will was probated, and the survivor accepted the benefits of the will. In 1936 he executed a second will purporting to revoke his 1916 reciprocal will, but the court enforced the 1916 will against the survivor's heirs in favor of the first brother's heirs. The oral testimony presented additional similarities in respect to execution of the Grim will in that there was no direct evidence of a contract not to revoke. Such contract was found from the circumstances previously mentioned together with oral testimony from the scrivener that he drafted the wills in accordance with the brothers' agreement, evidence from a witness that one testator referred to the wills as a "jint will," and from another who said the brothers called the wills a "contract, that is what they called it."

When Dr. Grim died in 1936, the 1929 joint will of Dr. and Mrs. Grim was admitted to probate and Mrs. Grim was appointed executrix as provided (agreed to) in the will. She administered the estate in accordance with the will and enjoyed as life tenant the lands owned by Dr. Grim as provided in the joint will. At least until 1959 she accepted and made use of such benefits as well as using the even greater amount of entirety property the same way. She also recognized, by her admissions, her obligations under the 1929 will and agreement made with her husband. From the death of her husband in 1936 until 1959 Mrs. Grim abided by the disposition called for in the 1929 joint will and admitted that her family and Dr. Grim's family were to share equally upon termination of her life estate. Such conduct is indicative of her recognition of her obligations, and only when she was 85 years of age, 30 years after her execution of the 1929 will, did she act in any way inconsistent with recognition of her contract with her husband.

Seat v. Seat, 172 Tenn. 618, 113 S.W.2d 751, 754 [4], is in point and is cited with approval in Stewart v. Shelton, supra, 201 S.W.2d l. c. 399: " 'The terms of the joint will, the fact that the greater part of the real estate was held by the entirety and might have passed to the survivor, that the property was acquired by the parties and owned jointly or in common, that defendant left the will in force from the date of execution

until her husband's death, and the equitable manner in which the parties disposed of their joint and common property, authorizes the inference that some sort of domestic prearrangement was made by Mr. and Mrs. Seat looking to an equitable division of their property and which culminated in their joint will. * * * such facts negative any conclusion but that the will was executed pursuant to agreement.' "

■ The admissions made by Mrs. Grim interpreting her situation as a life tenant under a contract and joint will, unable to sell or dispose of any lands, are competent evidence of the existence and nature of a contract. See Glueck v. McMehen, supra, 318 S.W.2d l. c. 374; Shackleford v. Edwards, supra, 278 S.W.2d l. c. 778; Findley v. Johnson, Mo., 142 S.W.2d 61, 65 ("I can't sell that property, any of it").

■ Appellants assert that the oral statements are too "technical in their terminology" to be "generally understood by the layman" and that they are merely "loose or casual conversation." Similar admissions have been found of probative value. For examples, see Loumar Development Co. v. Redel, Mo., 369 S.W.2d 252, 257 [15] (" * * * agreement prepared * * *"); Kidd v. Kidd, Mo.App., 216 S.W.2d 942, 946 [7] (error to exclude admissions as to ownership); Dreckshage v. Dreckshage, 352 Mo. 78, 176 S.W.2d 7, 13 [4] (error to exclude exhibits containing admissions using expressions of interest such as "trustee" and "this trust"); Stewart v. Shelton, supra, 201 S.W.2d l. c. 397 ("lifetime claim"). Mrs. Grim's statements are material and of particular probative value when viewed in the light of her education as a schoolteacher and her 30-years' experience in managing over 900 acres of farmland. They also are of particular value when connected to real estate, title to which was taken by the entirety, which, except for her acknowledged agreement, she would have been able to sell to Mr. Keyes or at any other time following her husband's death. Similarly, she would not have applied for insurance on the farm buildings as having only a life estate if she were, in fact, the fee owner as the survivor of an entirety.

A good summary of requirements which must be satisfied in order to establish a contract to execute joint wills that shall be and remain irrevocable from the date of their execution may be found in Workbook for Missouri Estate Planners, 1966, The Bobbs-Merrill Company, Inc., Chapter 11, Section EO.2, page 21: "(1) There must be a definite agreement, fair and just and certain as to terms and subject matter, to dispose of the property as the will provides (Stewart v. Shelton, supra). (2) There must be specific agreement that the wills be irrevocable (Glidewell v. Glidewell, 360 Mo. 713, 230 S.W.2d 752 (1950)). (3) The agreement must be based upon a sufficient consideration (Stewart v. Shelton, supra). The existence of such a contract must be shown by clear, cogent and convincing evidence. Jeffress v. Piatt, Mo., 370 S.W.2d 383 (1963)."

■ The evidence in this case satisfies this expression of the requirements necessary to establish irrevocability of the Grims' joint will as well as the similar expression of the law and requirements in other cases, particularly Plemmons v. Pemberton, supra.

Certain of appellants' citations already have been discussed. In addition, they cite other cases which are distinguishable: In re Opel's Estate, Mo., 352 Mo. 592, 179 S.W.2d 1, holds that an oral contract to execute mutual wills cannot be established by loose or casual conversations. The case is otherwise of no value to appellants, however, because the only testimony bearing upon the alleged agreement was "indefinite and uncorroborated by any other circumstance. The wills were not made at the same time * * *, are not reciprocal, differ in their terms and do not comply with the alleged agreement testified to by (the witnesses)." 179 S.W.2d l. c. 4 [3]. Wanger v. Marr, supra, also refused enforcement of an alleged contract to execute mutual wills. The

testators there were John and Barbara Marr who, in 1895, executed separate wills giving each a life estate in the property of the other with remainder to the plaintiff and defendant. John executed a second will and about a year later Barbara died. There was testimony that John had stated to witnesses that he and his wife had "agreed" as to what they wanted in the wills and that they had entered into an agreement on what the wills would provide. Neither of the separate wills contained any recitals which would indicate them to be "other than an ordinary last will and testament." 165 S.W. 1. c. 1029. "The witness Porter knew nothing and heard nothing of any agreement between Barbara and John * * *. Stigall drew both wills. His testimony and the will of 1897, drawn by him, indicate he is a man of intelligence. It is strange, if he knew of any agreement carried into effect by the will of 1895 and violated by the will of 1897, that he should have utterly forgotten drawing the will of 1897. * * * The statement of John Marr * * * had no bearing upon the question of the existence of an agreement between John and Barbara, and, if made, is directly contradicted by the witnesses Stigall and Porter, * * *. The fact the wills (which were different) were made on the same day and that in each the maker of the other was given a like estate in the property devised is evidence of concert of action, but not sufficient to prove the existence of a binding contract." 165 S.W. 1. c. 1031 [5]. That case overruled Bower v. Daniel, 198 Mo. 289, 95 S.W. 347, in its holding that only a preponderance of the evidence was needed to prove a contract of this nature; but, otherwise, the case held in favor of an alleged contract to be bound by a joint will under a joint will, and circumstances similar to those surrounding the Grims' joint will. Edson v. Parsons, 155 N.Y. 555, 50 N.E. 265, is yet another case on the burden of proof in these situations, but it is not in point for the reason found in the language of the case itself in Plemmons v. Pemberton, supra, 139 S.W.2d 1. c. 918: " 'It was not claimed * * * that there was any formally expressed contract

between the sisters, or that such a contract for the making of mutual wills is evidenced, except by the wills themselves, and by some facts relating to and illustrating their making and execution, and the strong attachment which united the sisters to their brother.' "

Appellants contend also that even if the existence of a contract to make an irrevocable joint will be found, the court erred in holding that the property held by Dr. and Mrs. Grim as tenants by the entirety passed under the will.

 "It is true that ordinarily a will does not affect property held in an estate by the entirety. It is also true, however, that a husband and wife acting jointly may agree upon the ultimate disposition of their entirety property." Shackleford v. Edwards, supra, 278 S.W.2d 1. c. 781 [9, 10]; Stewart v. Shelton, supra, 201 S.W.2d 1. c. 398 [8, 9]. Both of these cases enforced contracts to make mutual irrevocable wills and properties held by entirety were affected. See also Ashbaugh v. Ashbaugh, 273 Mo. 353, 201 S.W. 72, 73 [1], on creation of tenancy by the entirety.

The thrust of appellants' argument is that there was no showing "of an agreement between Dr. Grim and Mrs. Grim to include the after-acquired entirety property (the Knox County lands held by the entirety) in the terms of that will." In the absence of such a showing, the entirety property would, of course, have passed by operation of law to Mrs. Grim as the surviving spouse and not under the joint will upon the death of the survivor.

 Reference to the will previously set out both in full and in part shows that the Grims did intend to include their after-acquired entirety properties in their contract and joint will. In paragraph Second they provided that " * * * all of our property * * * of which we may be possessed at the time of the decease of either of us, shall be held by the survivor" for life; the

right to use the same for life "shall not be construed * * * to mean that the survivor shall have the right to sell any of the real estate owned by either of us at the date of death." Item Third disposes of "all * * * of our property * * * wherever situate and existing at the * * * death of the survivor," half to Dr. Grim's heirs and half to Mrs. Grim's heirs. Even though the evidence shows that at the execution of the will all real estate was then owned by Dr. Grim, yet the joint will covers "our" property as it may exist at the death of either. "Our" would have no meaning if all properties owned by both were not included. Similarly, reference to all property existing at the death of the survivor would be meaningless unless it included after-acquired property regardless of how acquired. If Dr. and Mrs. Grim had not intended to dispose of their properties in the fair and equitable manner found by the court, it would have been a simple matter to provide differently or to have revoked their contract by agreement prior to Dr. Grim's death. Certainly people of the ability of the Grims took title to property by the entirety with full knowledge of their prior agreement and will. This is evidenced in Mrs. Grim's admission during the years following her husband's death. As said in Shackleford v. Edwards, supra, 278 S.W.2d 1. c. 781 [8]: "Now the same evidence which convinces us that there was a definite agreement between the Crawfords to make mutual irrevocable wills also convinces us that those wills were to provide for the ultimate disposition of their separate properties which simultaneously were placed in an estate by the entirety." See Mueller v. Buenger, 184 Mo. 458, 83 S.W. 458, where a residuary clause using language similar to that in the Grim joint will was held to contemplate after-acquired property.

Glidewell v. Glidewell, 360 Mo. 713, 230 S.W.2d 752, cited by appellants, simply recognized that there was not sufficient evidence from which to infer a contract to make joint and mutual wills.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

HOLMAN, P. J., HENLEY and SEILER, JJ., and HAYES, Special Judge, concur.